969 P.2d 21 (1998)
137 Wash.2d 1
In re the CUSTODY OF Sara Skyanne SMITH.
Edison Smith, et al., Respondents,
v.
Kelly STILLWELL-Smith, Appellant.
In re Visitation Rights with Justin Ross Wolcott,
David L. Clay, Petitioner, and
Lisa Wolcott, Respondent.
In re the Visitation of Natalie Anne Troxel, Isabelle Rose Troxel, Minors,
Jenifer Troxel and Gary Troxel, Paternal Grandparents, Petitioners, and
Tommie Granville, Mother, Respondent.
Nos. 65605-3, 65699-1, 66207-0.
Supreme Court of Washington, En Banc.
Argued March 11, 1998.
Decided December 24, 1998.
*23 Weber & Gunn, Kenneth W. Weber, Vancouver, Amicus Curiae on behalf of Kenneth Weber.
Cathy J. Zavis, Patricia Novotny, Seattle, Amicus Curiae on behalf of Northwest Women's Law Center.
Christon Skinner, Oak Harbor, for Appellant.
Mark Olson, Seattle, David Metcalf, Everett, for Petitioner.
Catherine Smith, Howard Goodfriend, Seattle, Kenneth Masters, Bainbridge Island, for Appellant Stillwell-Smith and Respondent Granville.
Claire Reiner, Anacortes, Guardian Ad Litem.
Mark Theune, Oak Harbor, Grace Wagner, Everett, for Respondent.
*22 MADSEN, J.
The issues presented in these three consolidated cases are whether petitioners had standing to petition for visitation under either RCW 26.10.160(3) or former RCW 26.09.240 and whether these statutes violate the parents' constitutionally protected interest in raising their children without state interference. We conclude petitioners have standing but, as written, the statutes violate the parents' constitutionally protected interests. These statutes allow any person, at any time, to petition for visitation without regard to relationship to the child, without regard to changed circumstances, and without regard to harm.

STATEMENT OF THE CASE
Wolcott. Justin Wolcott was born April 10, 1986. After Justin was born, Justin's mother, Lisa, began a relationship with David Clay. The three lived together from May 1988 until 1992. After Wolcott and Clay separated, Clay continued to see Justin. However, relations between Wolcott and Clay deteriorated and, in November, Clay petitioned pursuant to RCW 26.10.160(3) to establish visitation rights with Justin. A court commissioner entered a temporary order allowing visitation every other weekend. On motion for revision, Judge Wilson reduced visitation to one Saturday per month. Wolcott appealed that order to Division One, arguing that Clay lacked standing to seek visitation. Commissioner Ellis dismissed the appeal because no final appealable order had been entered. He also found no obvious or probable error and denied discretionary review.
Following a trial in October 1995, Judge Hansen dismissed Clay's petition for visitation holding that Clay lacked standing to seek visitation because he is not related to Justin and no custody action was pending. The court awarded Wolcott her attorneys fees. The Court of Appeals affirmed and awarded Wolcott additional attorneys fees for the appeal. In re Visitation of Wolcott, No. 37883-0-I, slip op. at 11 (Wash.Ct.App. Mar. 24, 1997). Clay sought and was granted review by this court.
Troxel. Natalie and Isabelle Troxel are the daughters of Brad Troxel and Tommie Granville, who never married. After their separation, Brad lived with his parents, Jenifer and Gary Troxel, and the girls visited their father at their grandparents' home on occasion. Brad committed suicide in May 1993. At first the girls continued to visit the Troxels regularly, but their mother soon decided to limit visitation. In December 1993, the Troxels filed a petition pursuant to RCW 26.10.160(3) and former RCW 26.09.240 to obtain visitation rights with their grandchildren. In 1995, the trial court entered a visitation decree ordering visitation one weekend per month, one week during the summer, and four hours on each of the Troxels' birthdays. Granville appealed, during which time she married Kelly Wynn, who adopted the girls in February 1996. The Court of Appeals remanded for entry of findings of fact and conclusions of law, which were entered in January 1996.
*24 The Court of Appeals subsequently reversed the visitation order and dismissed the Troxels' petition for visitation holding that nonparents lack standing to seek visitation unless a custody action is pending. In re Visitation of Troxel, 87 Wash.App. 131, 940 P.2d 698 (1997). The Troxels sought and were granted review by this court.
Smith. Brian Smith and Kelly Stillwell were married in 1989. In 1992, Stillwell gave birth to daughter, Sara, conceived through artificial insemination (Brian was not the donor). In 1995, Stillwell petitioned for dissolution of the couple's marriage. Both parties sought custody of Sara. On February 25, 1996, Stillwell's mother went to Brian's home and shot him. Brian fired back, and they were both killed. A dispute then developed between Stillwell and Brian's surviving family members (his parents, brother, and sister) regarding when and to what extent Sara should have contact with them. Consequently, the Smith family petitioned for visitation rights with Sara. Following a trial held in April 1997, the trial court granted the petition, under former RCW 26.09.240, and established a visitation schedule. Stillwell appealed the order to Division One of the Court of Appeals. The court granted the Smiths' motion to transfer the appeal to this court. All three cases were consolidated for review.

DISCUSSION
The parties in this case sought visitation rights pursuant to RCW 26.10.160(3) and former RCW 26.09.240, both of which address visitation rights of nonparents. RCW 26.10.160(3) provides:
Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.
Former RCW 26.09.240 (prior to 1996 amendments) provides:
The court may order visitation rights for a person other than a parent when visitation may serve the best interest of the child whether or not there has been any change of circumstances.
A person other than a parent may petition the court for visitation rights at any time.
The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child.
The question before this court is whether a nonparent petitioner has standing pursuant to RCW 26.10.160(3) or former RCW 26.09.240 to petition for visitation with a child outside the context of custody or dissolution proceedings. Even if the nonparent petitioners do have standing to sue, appellant, Kelly Stillwell, argues that the statutes impermissibly violate a parent's fundamental right to autonomy in child-rearing matters.

STANDING
At issue in each of these cases is whether RCW 26.10.160(3) and former RCW 26.09.240 permit a nonparent to seek visitation in the absence of a custody proceeding. The parents argue that the question should be answered in the negative and ask this court to find that the individuals who petitioned for visitation rights lack standing under the applicable statutes. The petitioners respond stating that the plain meaning of RCW 26.10.160(3) and former RCW 26.09.240 allow them to petition for visitation absent a custody proceeding noting that both statutes allow "any person" to petition for visitation at "any time." We hold that the plain language of the statutes gives Clay and the Troxels standing to petition for visitation rights under RCW 26.10.160(3) and the Smiths standing to petition for visitation under former RCW 26.09.240.
In answering the question before this court we must interpret the meaning of RCW 26.10.160(3) and former RCW 26.09.240. We review questions of statutory construction de novo. Our Lady of Lourdes Hosp. v. Franklin County, 120 Wash.2d 439, 443, 842 P.2d 956 (1993). The purpose of statutory interpretation is to determine and give effect to legislative intent. Duke v. Boyd, 133 Wash.2d 80, 87-88, 942 P.2d 351 *25 (1997). Legislative intent is primarily determined from the statutory language. Id.
When the words in a statute are clear and unequivocal, this court is required to assume the Legislature meant exactly what it said and apply the statute as written. Although the court should not construe statutory language so as to result in absurd or strained consequences, neither should the court question the wisdom of a statute even though its results seem unduly harsh.

Id. at 87, 942 P.2d 351 (citations omitted). This court has emphasized that it will not construe unambiguous language and that it "assume[s] that the legislature means exactly what it says." State v. McCraw, 127 Wash.2d 281, 288, 898 P.2d 838 (1995) (quoting Sidis v. Brodie/Dohrmann, Inc., 117 Wash.2d 325, 329, 815 P.2d 781 (1991)).
Both RCW 26.10.160 and RCW 26.09.240 address the rights of nonparents to seek visitation with a child. Both statutes have been amended several times, most recently in 1996. As originally enacted in 1973, as part of a chapter having mainly to do with parenting plans in dissolution actions, former RCW 26.09.240 provided that a parent not granted custody of a child is entitled to reasonable visitation rights unless visitation would endanger the child's health. It also said, "[t]he court may order visitation rights for any person when visitation may serve the best interest of the child." Laws of 1973, 1st Ex.Sess., ch. 157, § 24. In 1976, the Court of Appeals held the phrase "any person" did not authorize trial courts to grant visitation rights to "third person," including grandparents, absent a change of circumstances, such as death of one or both parents or termination of the nuclear family unit. Carlson v. Carlson, 16 Wash.App. 595, 597, 558 P.2d 836 (1976).
The following year, the Legislature amended RCW 26.09.240 to read: "The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change in circumstances. Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings." Laws of 1977, 1st Ex.Sess., ch. 271, § 1. The statute retained its original language regarding visitation rights of parents denied custody.
In 1987, the Legislature adopted an extensive bill regarding parenting, child custody and child support. Laws of 1987, ch. 460. One section of that bill amended RCW 26.09.240 to omit references to visitation rights of parents denied custody and also to delete the phrase "including, but not limited to, custody proceedings." Laws of 1987, ch. 460, § 18. Thus, as amended, RCW 26.09.240 read, "The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances. Any person may petition the court for visitation rights at any time." Id.
In another section of this bill, the Legislature created a new statute which overlapped both the old and new versions of RCW 26.09.240. This new statute gave presumptive visitation rights to parents denied custody and allowed trial courts to order visitation rights "for any person" to petition for such rights "any time including, but not limited to, custody proceedings." Laws of 1987, ch. 460, § 44. Although this statute dealt with visitation rights of both parents and nonparents, it was codified as RCW 26.10.160, in a new chapter titled "Nonparental Actions for Child Custody." Laws of 1987, ch. 460, § 25.
In 1989, the Legislature amended RCW 26.10.160 to clarify the circumstances under which a parent who is denied custody may be allowed visitation. Laws of 1989, ch. 326, § 2(1), (2). That amendment also divided the statute into four subsections, and placed the language regarding nonparent visitation rights in subsection (3). Laws of 1989, ch. 326, § 2(3). This subsection still permitted "any person" to seek visitation "at any time" including, but not limited to custody proceedings "whether or not there has been any change of circumstances." Laws of 1989, ch. 326, § 2(3). That same session, the Legislature also amended RCW 26.09.240 to permit "a person other than a parent" (rather than "any person") to petition for visitation. Laws of 1989, ch. 375, § 13.
*26 In 1994, the Legislature amended RCW 26.10.160 to further clarify the circumstances under which parents denied custody may be allowed (or denied) visitation. Laws of 1994, ch. 267, § 2. The Legislature made no changes to the subsection of the statute allowing "any person" to petition for visitation "at any time including, but not limited to, custody proceedings." Laws of 1994, ch. 267, § 2(3).
In 1996, the Legislature again amended both RCW 26.09.240 and RCW 26.10.160. RCW 26.09.240 now requires any nonparent seeking visitation to show that he or she has a significant relationship with the child. It also states that a "person other than a parent may not petition for visitation under this section unless the child's parent or parents have commenced an action under this chapter," which includes an action for dissolution of marriage, legal separation or modification of a parenting plan proceeding. Laws of 1996, ch. 177, § 1(1). As amended, RCW 26.09.240(6) also contains a list of factors for the trial court to take into consideration when making a determination of the child's best interests. Some of these factors are the strength of the relationship between the child and the petitioner, the relationship between the child's parents and the petitioner, the nature and reason for the parent's objection to visitation, and any criminal history or history of physical, emotional or sexual abuse or neglect by the petitioner. Additionally, the restrictions that apply under RCW 26.09.191 to parents also apply to a petitioner or intervenor who is not a parent. RCW 26.09.240(7).
The 1996 Legislature amended RCW 26.10.160 again to clarify the visitation rights of parents denied custody. Laws of 1996, ch. 303, § 2(1)-(2). The Legislature made no changes to subsection (3) of this statute, dealing with petitions for visitation by "any person" "at any time including, but not limited to, custody proceedings .... whether or not there has been any change of circumstances." Laws of 1996, ch. 303, § 2(3). There is no language limiting actions under RCW 26.10.160(3) in the manner they are limited under RCW 26.09.240.
Although the plain language of RCW 26.10.160(3) allows "any person" to petition for visitation "at any time," the Court of Appeals in Wolcott and Troxel relied on the 1996 changes in comparable language in RCW 26.09.240 as a basis for avoiding the plain language of the statute. Wolcott, 85 Wash.App. at 473, 933 P.2d 1066; Troxel, 87 Wash.App. at 136, 940 P.2d 698. The court in Wolcott stated it could not "conceive of any reason why the Legislature did not similarly amend RCW 26.10.160(3), a virtually identical provision in the parallel statute." Wolcott, 85 Wash.App. at 473, 933 P.2d 1066. The court, therefore, found that the Legislature unintentionally overlooked amending RCW 26.10.160(3). To correct that perceived oversight, the court deleted the provision of RCW 26.10.160(3) allowing "any person" to petition for custody at "any time including, but not limited to, custody proceedings" and replaced it with the 1996 amendment to RCW 26.09.240 prohibiting nonparents from bringing a visitation action "unless the child's parent or parents have commenced an action under this chapter." RCW 26.09.240(1). As interpreted by the Court of Appeals, both sections would prohibit nonparent visitation action under either chapter unless a custody proceeding is pending.
Our concern with the Court of Appeals analysis is its reluctance to address the plain language of RCW 26.10.160(3). Although the Legislature amended RCW 26.09.240 and other sections of RCW 26.10.160, it left RCW 26.10.160(3) untouched. By its plain language, RCW 26.10.160(3) gives nonparents an avenue to obtain visitation rights with children outside of a custody proceeding. We decline to construe the language of RCW 26.10.160(3) because we find that the language of the statute is unambiguous. Further, we will not read qualifications into the statute which are not there. A "court cannot read into a statute that which it may believe the legislature has omitted, be it an intentional or inadvertent omission." Automobile Drivers & Demonstrators Union Local 882 v. Department of Retirement Sys., 92 Wash.2d 415, 421, 598 P.2d 379 (1979) (citing Jepson v. Department of Labor & Indus., 89 Wash.2d 394, 573 P.2d 10 (1977)); accord State v. Taylor, 97 *27 Wash.2d 724, 728, 649 P.2d 633 (1982); Jenkins v. Bellingham Mun. Court, 95 Wash.2d 574, 579, 627 P.2d 1316 (1981). Thus, the petitioners in Wolcott and Troxel had standing to petition for visitation under RCW 26.10.160(3).
In Smith, application of former RCW 26.09.240 yields the same result. Appellant, Kelly Stillwell, asserts the trial court had no authority to order visitation with her daughter by third parties (the Smiths) outside of an action for custody or allegation she is an unfit mother.
However, when the Smiths filed their petition for visitation, RCW 26.09.240 did not require the existence of a pending action under RCW 26.09 as a precondition to a nonparents visitation petition. Former RCW 26.09.240 allowed "[a] person other than a parent" to "petition the court for visitation [rights] at any time." Thus, under the plain language of the statute, the Smiths could petition the court for visitation rights "at any time," as the trial court properly held.[1]

CONSTITUTIONALITY OF RCW 26.10.160(3) AND FORMER RCW 26.09.240
In Wolcott and Troxel, the Court of Appeals rewrite of RCW 26.10.160(3) is based on its concern that a literal reading of the statute would have the "intolerable" consequence of "stable families" being "forced to defend in court against visitation petitions having no basis." In re Visitation of Wolcott, 85 Wash.App. 468, 472, 933 P.2d 1066 (1997); see also In re Visitation of Troxel, 87 Wash.App. 131, 940 P.2d 698. While the statute as written may have potentially troubling consequences for stable families, this does not justify Court of Appeals rewriting of the statute.
Nevertheless, it is undisputed that parents have a fundamental right to autonomy in child rearing decisions. The United States Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without state interference. See Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446 (1923) (The liberty interest guaranteed by the Fourteenth Amendment includes freedom "to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children...."); Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510, 534, 45 S.Ct. 571, 39 A.L.R. 468, 69 L.Ed. 1070 (1925) (law prohibiting parents from sending children to private as opposed to public school unconstitutional because it would "unreasonably interferes with the liberty of parents ... to direct the upbringing and education of [their] children...."); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (Court recognized that "the custody, care and nurture of the child reside first in the parents .... it is in recognition of this that [our] decisions have respected the private realm of family life which the state cannot enter."); Wisconsin v. Yoder, 406 U.S. 205, 235-36, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (exempting Amish from the state compulsory education law requiring children to attend school beyond the eighth grade); Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (in determining the standard of proof necessary in termination of parental rights case, the Court noted its "historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment.")
The Supreme Court defined the nature of this constitutionally protected interest in Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), when it held unconstitutional an Illinois law which declared that, upon the death of the mother, children of unwed fathers become wards of the state:
The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. *28 It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements."
The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential", "basic civil rights of man".... "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment....
(Citations omitted.)
The family entity is the core element upon which modern civilization is founded. Traditionally, the integrity of the family unit has been zealously guarded by the courts. The safeguarding of familial bonds is an innate concomitant of the protective status accorded the family as a societal institution. A parent's constitutionally protected right to rear his or her children without state interference, has been recognized as a fundamental "liberty" interest protected by the Fourteenth Amendment and also as a fundamental right derived from the privacy rights inherent in the constitution. Where a fundamental right is involved, state interference is justified only if the state can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved. See Roe v. Wade, 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); O'Hartigan v. Department of Personnel, 118 Wash.2d 111, 117, 821 P.2d 44 (1991); In re Welfare of Sumey, 94 Wash.2d 757, 762, 621 P.2d 108 (1980).
In answering whether the state visitation statutes at issue serve a compelling state interest we must understand the sources of state power to intrude on family life. The state may act pursuant to its authority to protect citizens from injuries inflicted by third persons or to protect its citizens from threats to health and safety. Thus, in the context of family life, the state's police power gives it the authority to require the vaccination of children against communicable diseases over the objection of their fit parents. See Prince, 321 U.S. at 166-67, 64 S.Ct. 438. Similarly, the state may step in and override a decision of a parent where the decision would harm the child. In Prince v. Massachusetts, for example, the Supreme Court refused to invalidate legislation which prohibited a parent from permitting a minor to sell merchandise on a public street. Prince, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645. Although the Court acknowledged the parent's constitutionally protected right to child-rearing autonomy, it found a narrow exception necessary in light of the "crippling effects of child employment," "more especially in public places." Id. at 168, 64 S.Ct. 438. Police power thus empowered the state to intrude on a parental decision in the interests of society as a whole where the decision directly and severely imperiled the child.
The state's other source of authority to intrude on a family's autonomy is its parens patriae power. As parens patriae the state acts from the viewpoint and in the interests of the child. Like the state's police power the state may act only pursuant to its parens patriae power where a child has been harmed or where there is a threat of harm to a child. See Yoder, 406 U.S. at 206, 92 S.Ct. 1526. Both parens patriae power and police power provide the state with the authority to act to protect children lacking the guidance and protection of fit parents of their own, and although they may represent different perspectives, both contemplate harm to the child and, in practical terms, have been used nearly interchangeably in the fashioning of a threshold requirement of parental unfitness, harm, or threatened harm. See Joan C. Bohl, The "Unprecedented Intrusion": A Survey and Analysis of Selected Grandparent Visitation Cases, 49 Okla. L.Rev. 29 (1996).
For example, in Yoder, the Supreme Court held that the First and Fourteenth Amendments *29 prevented the state from compelling Amish parents to send their children to public school after completion of the eight grade. Yoder, 406 U.S. at 205, 92 S.Ct. 1526. The state argued, based on the Court's prior decision in Prince, that such a decision fails to give due regard to the power of the state as parens patriae to extend the benefit of the secondary education to children regardless of the wishes of their parents. Yoder, 406 U.S. at 229, 92 S.Ct. 1526. The Court explained that in Prince, the Legislature was within its authority to curtail the evils associated with child labor. Id. at 230, 92 S.Ct. 1526. But unlike Prince, the case presented in Yoder was "not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred." Id.
These parties who have petitioned for visitation rights argue that former RCW 26.09.240 and RCW 26.10.160(3) serve a compelling state interest that warrants use of the state's parens patriae power to impose visitation with third persons where the visitation serves the "best interest of the child." Petitioners contend that a judicially determined finding that visitation is in the best interests of the child is a sufficiently compelling justification to override a parent's opposition, regardless of the fact that the parent's fitness is not challenged or that there has been no showing of harm or threatened harm to the child.
However, the Supreme Court cases which support the constitutional right to rear one's child and the right to family privacy indicate that the state may interfere only "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." Yoder, 406 U.S. at 234, 92 S.Ct. 1526. In Yoder, for example, the Court deemed significant the fact that Amish children would not be harmed by receiving an Amish education rather than a public education. Yoder, 406 U.S. at 230, 92 S.Ct. 1526. Likewise, in Pierce, the Court found that parents' decisions to send their children to private schools were "not inherently harmful," as there was "nothing in the ... records to indicate that [the private schools] have failed to discharge their obligations to patrons, students, or the state." Pierce, 268 U.S. at 534, 45 S.Ct. 571. In Meyer, a case in which a teacher had been convicted of teaching a child German, the Court found that "proficiency in a foreign language ... is not injurious to the health, morals or understanding of the ordinary child," and thus the state's desire "to foster a homogeneous people with American ideals" was insufficient justification for forbidding foreign language instruction. Meyer, 262 U.S. at 402-03, 43 S.Ct. 625. In Stanley, the Court required an individualized finding of parental neglect before stripping an unwed father of his parental rights. 405 U.S. at 645, 92 S.Ct. 1208. On the other hand, the Court upheld the conviction of the mother who allowed her child to sell magazines, approving state interference designed to prevent "psychological or physical injury" to the child. Prince, 321 U.S. at 170, 64 S.Ct. 438. It is clear from Supreme Court precedent that some harm threatens the child's welfare before the state may constitutionally interfere with a parent's right to rear his or her child.
Washington has followed suit, allowing state interference with parents' rights to raise their children only where the state seeks to prevent harm or a risk of harm to the child. This court has emphasized that a state can only intrude upon a family's integrity pursuant to its parens patriae right when "parental actions or decisions seriously conflict with the physical or mental health of the child." In re the Welfare of Sumey, 94 Wash.2d at 762, 621 P.2d 108 (citing Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Yoder, 406 U.S. at 230, 92 S.Ct. 1526).
In Sumey, parents were temporarily denied custody of their child pursuant to former RCW 13.32,[2] which allowed for the temporary alternative placement of a child outside the parents' home. Sumey, 94 Wash.2d at 758-59, 621 P.2d 108. Under former RCW 13.30.020, repealed by Laws of 1979, ch. 155, § 86, a child could be placed into limited custody where the child had *30 been reported as a runaway or when a law enforcement officer believed the child was in circumstances which constituted imminent and substantial danger to the child's physical safety. The state could then, at the request of the child or the parents, place the child in a temporary[3] alternative residential placement if the Court found by a preponderance of the evidence that the petition was not capricious and that there was "a conflict between the parent and child that cannot be remedied by counseling, crisis intervention, or continued placement in the parental home." Id. at 764, 621 P.2d 108 (quoting former RCW 13.32.040, repealed by Laws of 1979, ch.155, § 86).
In Sumey, we concluded that the state properly acted pursuant to its parens patriae power finding that former RCW 13.32 was enacted to "safeguard the mental and emotional health of the child by removing him or her from a situation of family conflict that is so extreme that the parents and child are unable to live together even with the aid of counseling." Id. at 764, 621 P.2d 108. Additionally, the court emphasized that the statute also protected the "physical health of children like [Sumey] ... who [were] driven by the family conflict to run away from home and expose themselves to the physical dangers that attend running away." Id. at 764-65, 621 P.2d 108.[4]
In contrast, this case presents no such compelling interest of the state. The statutes at issue do not contemplate any similar harm or potential harm to the child which must be prevented by third party visitation rights. Accordingly, the parens patriae authority does not justify the interference with parental rights permitted by these statutes.
One court aptly emphasized that "[t]he requirement of harm is the sole protection that parents have against pervasive state interference in the parenting process." Hawk v. Hawk, 855 S.W.2d 573, 580 (Tenn. 1993).
For the state to delegate to the parents the authority to raise the child as the parents see fit, except when the state thinks another choice would be better, is to give the parents no authority at all. "You may do whatever you choose, so long as it is what I would choose also" does not constitute a delegation of authority.
Id. (quoting Kathleen Bean, Grandparent Visitation: Can the Parent Refuse?, 24 U. Louisville J. Fam. L. 393, 441 (1985-86)).
We recognize that in certain circumstances where a child has enjoyed a substantial relationship with a third person, arbitrarily depriving the child of the relationship could cause severe psychological harm to the child. The difficulty, however, is that such a standard is not required in RCW 26.10.160(3) or in former RCW 26.09.240. Both statutes allow "any person" to petition for forced visitation of a child at "any time" with the only requirement being that the visitation serve the best interest of the child. There is no threshold requirement of a finding of harm to the child as a result of the discontinuation of visitation.
Short of preventing harm to the child, the standard of "best interest of the child" is insufficient to serve as a compelling state interest overruling a parent's fundamental rights. State intervention to better a child's quality of life through third party visitation is not justified where the child's circumstances are otherwise satisfactory. To suggest otherwise would be the logical equivalent to asserting that the state has the authority to break up stable families and redistribute its *31 infant population to provide each child with the "best family." It is not within the province of the state to make significant decisions concerning the custody of children merely because it could make a "better" decision.
Additionally, the statutes lack other safeguards to prevent stable families from defending in court against frivolous petitions for visitation. Most notably the statutes do not require the petitioner to establish that he or she has a substantial relationship with the child. It seems that at a minimum such a showing should be required because harm to a child cannot reasonably be anticipated as a result of no contact with someone with whom the child has had no such relationship. Also, the statutes do not require the court to take into consideration such factors as the parents' reasons for restricting visitation with the petitioner or any allegations of past physical or mental abuse by petitioner when making a visitation determination.
Parents have a right to limit visitation of their children with third persons. The law's concept of the family rests "on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment...." Brooks v. Parkerson, 265 Ga. 189, 192, 454 S.E.2d 769 (1995). Some parents and judges will not care if their child is physically disciplined by a third person; some parents and judges will not care if a third person teaches the child a religion inconsistent with the parents' religion; and some judges and parents will not care if the child is exposed to or taught racist or sexist beliefs. But many parents and judges will care, and, between the two, the parents should be the ones to choose whether to expose their children to certain people or ideas. See Kathleen Bean, Grandparent Visitation: Can the Parent Refuse?, 24 U. Louisville J. Fam. L. 393 (1985-6). RCW 26.10.160(3) and former RCW 26.09.240 impermissibly interfere with a parent's fundamental interest in the "care, custody and companionship of the child." Sumey, 94 Wash.2d at 762, 621 P.2d 108.

ATTORNEYS FEES
Both RCW 26.09.140 and RCW 26.10.080 allow either party, based on financial need to recover attorneys' fees and costs from another party as a result of maintaining or defending any proceeding under either chapter upon a showing of financial need. Additionally upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs. RCW 26.09.140; RCW 26.10.080. In deciding whether to award fees and costs, the court must balance the needs of the party requesting fees against the other parties' ability to pay. In re Marriage of Harrington, 85 Wash.App. 613, 935 P.2d 1357 (1997).
In In re Custody of Smith, the trial court declined to award either party costs or reasonable attorneys fees pursuant to RCW 26.09.140 and RCW 26.10.080. On appeal, Kelly Stillwell asserts the trial court erred its decision denying attorneys fees and costs. She also asks for attorneys fees and costs incurred on appeal.[5] Ms. Stillwell, however, has not shown that the trial court abused its discretion in its determination. See In re Marriage of Knight, 75 Wash.App. 721, 729, 880 P.2d 71 (1994) (the party challenging the award bears the burden of proving that the trial court exercised this discretion in a way that was clearly untenable or manifestly unreasonable). Pursuant to RAP 18.1(c) Ms. Stillwell has filed an affidavit of financial need to this court in support of her request for an award of fees and costs on appeal.
Likewise, neither the Troxels nor Ms. Granville were awarded fees or costs below. Ms. Granville asks this court pursuant to RCW 26.09.140 and RCW 26.10.080 to award her attorneys fees and costs on appeal. She has filed an affidavit reflected her financial need as required by RAP 18.1(c).
Finally, Ms. Wolcott was awarded attorneys fees by both the trial court and on appeal pursuant to RCW 26.10.080. Clay *32 asks this Court to review the award of the fees below. Like the Court of Appeals, we find no abuse of discretion in the trial court's award. Ms. Granville asks for an award of fees and costs on appeal to this court and has filed the necessary financial affidavits.
We remand to the trial courts to determine whether these parties have established sufficient financial need to warrant an award of attorneys fees and costs on appeal, the financial ability of the parties to pay, and if an award is warranted the proper amount.
DOLLIVER, SMITH, JOHNSON and SANDERS, JJ., concur.
TALMADGE, J., concurring/dissenting.
While I agree with the majority's holding that the plain language of RCW 26.10.160(3) and former RCW 26.09.240 provides the petitioners standing to seek visitation with the respective children in these consolidated cases, I disagree with the majority's view that such visitation intrudes unconstitutionally into the realm of parents' protected interests. By eliminating the limited right these statutes provides for nonparents to seek visitation with children, the majority opinion will have cruel and far-reaching effects on loving relatives, particularly grandparents of children like the Troxels here, depriving them in many instances of any contact with their grandchildren. For these reasons, I respectfully dissent.
The majority correctly determines the plain language of RCW 26.10.160(3) compels the conclusion that the petitioners in these cases had standing. But the majority holds RCW 26.10.160(3) and former RCW 26.09.240 impermissibly interfere with a parent's fundamental interest in the "care custody and companionship of the child." Majority op. at 31 (quoting In re Welfare of Sumey, 94 Wash.2d 757, 762, 621 P.2d 108 (1980)). This holding is based on two flawed premises: First, a parent's fundamental right to autonomy in child-rearing decisions is unassailable, and, second, the State's parens patriae power to act in a child's welfare may not be invoked absent a finding of harm to the child or parental unfitness. Majority op. at 27-29.
A. Parental Rights Are Not Absolute
As the majority notes, parental rights regarding the care and custody of their children are well established. See Majority op. at 27. It is equally true, however, such rights are not absolute. As the majority asserts, the Supreme Court in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), indeed noted "custody, care and nurture of the child reside first in the parents[,]" but went on to hold:
[b]ut the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. And neither rights of religion nor rights of parenthood are beyond limitation ... the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and ... this includes, to some extent, matters of conscience and religious conviction.
Prince, 321 U.S. at 166-67, 64 S.Ct. 438 (citations omitted). The majority focuses on only a portion of the equation. The constitutional issue in these consolidated cases concerns the parameters and balancing of rights and interests of the State and child, as well as those of the parents.
We have previously addressed the parameters of the rights of parents and the State's parens patriae power to act in the child's best interests in Sumey, 94 Wash.2d 757, 621 P.2d 108. There, we balanced the rights of the parents, child and State, broadly interpreting the State's parens patriae right to intervene and protect a child as a valid justification for temporary residential placement of the child under RCW 13.32, stating:
The liberty and privacy protections of the due process clause of the Fourteenth Amendment establish a parental constitutional right to the care, custody, and companionship of the child. This constitutionally protected interest of parents has been described as a "sacred right" which is "`more precious ... than the right of life itself.'"
The parents' constitutional rights, however, do not afford an absolute protection against State interference with the family relationship. Although "[h]istorically, the *33 natural parent's right to custody of a child... [was considered to be] absolute, barring a showing of unfitness ... [g]rowing concern for the welfare of the child and the disappearance of the concept of the child as property has led to a gradual modification in judicial attitude." It is now well established that when parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child. As we observed in State v. Koome, 84 Wash.2d 901, 907, 530 P.2d 260 (1975),
Although the family structure is a fundamental institution of our society, and parental prerogatives are entitled to considerable legal deference ... they are not absolute and must yield to fundamental rights of the child or important interests of the State.
Thus, in assessing the constitutionality of a procedure which infringes upon parents' rights to the care, custody, and companionship of their children, it is necessary to ascertain the proper balance between the parents' constitutional rights and the State's constitutionally protected parens patriae interest in protecting the best interests of the child.
Sumey, 94 Wash.2d at 762-63, 621 P.2d 108 (most citations omitted) (emphasis added) (alterations in original). Accord, Washington State Coalition for the Homeless v. Department of Soc. & Health Servs., 133 Wash.2d 894, 923, 929-30, 949 P.2d 1291 (1997).
Key to the balancing test we applied in Sumey was the degree of abridgment of parental rights which residential placement of the child entailed. We contrasted the temporary residential placement at issue with termination of parental rights and dependency proceedings. In so doing, we observed the requisite balancing called for appropriate justification for the severity of the abridgment of parental rights sought by the State. The termination of parental rights is an extreme abridgment of a parent's constitutional rights to care, custody and companionship of a child which requires the commensurately grave circumstance of harm (physical, mental or emotional) to the child resulting from the parent's conduct. But we contrasted this extreme abridgement with residential placement, explaining:
[temporary] residential placement ... does not infringe upon parental rights as severely as does a dependency adjudication or termination of parental rights.... An adjudication of dependency (on grounds such as parental abuse, neglect, or abandonment) can result in placement of the child in a foster home and transfer of certain legal rights and duties to the foster parents ..., and can ultimately result in full termination of parental rights if the parents do not correct the behavior which led to the finding of dependency. In contrast, a [temporary] residential placement... does not result in the transfer of any legal rights and duties to the custodians of the child and such a placement cannot serve as a basis for a subsequent termination of parental rights.
Sumey, 94 Wash.2d at 763, 621 P.2d 108 (citations omitted). In Sumey, we upheld the placement of the child outside the home against the parent's wishes because:
The degree of intrusion upon the parents' rights is relatively minor in that the parents retain custody over the child, the placement outside the home is designed to be temporary and to end as soon as the family conflict has been resolved ... On balance, the substantial interests of the State and child are sufficient to justify the limited infringement upon the parents' rights.
Id. at 765, 621 P.2d 108. Similarly, where visitation is awarded to nonparents in furtherance of the best interests of the child under the visitation statutes at issue here, the parents retain custody over the child. The allowance of visitation is even less intrusive than out of home residential placement of a child. Thus, our rationale in Sumey suggests where visitation is awarded under the statutes in question, the minor infringement on parental rights resulting from such visitation is permissible.
Furthermore, the United States Supreme Court cases striking down state action upon which the majority relies do not argue to the contrary. They involve substantial infringements *34 of parents' (or others') rights. See Majority op. at 29, relying on Wisconsin v. Yoder, 406 U.S. 205, 219, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972) (grave endangerment or destruction of free exercise of parents' religious beliefs); Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 39 A.L.R. 468 (1925) (unreasonable interference with liberty of parents to direct the upbringing and education of their children where parents wanted to send their children to established religious or military schools); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446 (1923) (a prohibition on teaching foreign languages in any school to children who had not yet completed eighth grade); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (presumptive termination of unwed father's parental rights). Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights based on insufficient evidentiary standard). Such is not the case here.
Instructive is the response of the Indiana Appellate Court, addressing the same argument the majority makes here, based on many of the same cases upon which the majority relies. Upholding its Grandparent Visitation Act, the court in Sightes v. Barker, 684 N.E.2d 224, 230 (Ind.Ct.App.), transfer denied, 690 N.E.2d 1187 (Ind.1997), opined:
Unlike these significant infringements, visitation rights by grandparents as defined by the Act are less than a substantial encroachment on the parent's fundamental rights or the autonomy of the nuclear family. The Act contemplates occasional, temporary visitation, which may only be allowed if a trial court finds visitation to be "in the best interests of the child."... the Act does not presume that grandparent visitation is necessarily in the children's best interest. Instead, the burden is on the grandparent, as the petitioning party, to demonstrate ... that court-ordered visitation is in the children's best interest. If such a showing is made, it falls to the court to evaluate the evidence, assess the circumstances, and carefully devise a visitation schedule that is in the children's best interest.
As such, permitting grandparent visitation over the adoptive parents' objection does not unconstitutionally impinge upon the integrity of the adoptive family.
Sightes, 684 N.E.2d at 230 (citations omitted). The same is true of the visitation statutes in question here. The minor encroachment of parental rights possible under these statutes is permissible under Sumey.
B. Parens Patriae
The majority's insistence that a showing of harm to the child or parental unfitness is required before the State's parens patriae power may be brought to bear is incorrect. In Sumey, there was no assertion of parental unfitness or harm to the child, yet we upheld the temporary residential placement of a child outside the home as a valid exercise of the State's parens patriae power to act in the child's best interests. See Sumey, 94 Wash.2d at 762-65, 621 P.2d 108. See also State v. Steinbach, 101 Wash.2d 460, 679 P.2d 369 (1984), in which Justice Dolliver, dissenting on a different issue, explained our holding in Sumey as follows:

Sumey involved the question of whether the residential placement procedures of former RCW 13.32 violate due process by authorizing placement of a minor without a prior finding of parental unfitness. In that case, the child had petitioned the court and been granted an ARP [alternative residential placement]. Her parents challenged the constitutionality of the statute. As the majority points out, the case discusses the importance of the parent-child relationship. The holding, however, is that the "limited infringement upon parental rights" by the ARP does not violate due process.

Steinbach, 101 Wash.2d at 464-65, 679 P.2d 369 (Dolliver, J., dissenting) (emphasis added). Indeed, the provisions of RCW 13.32 may be invoked where a parent and child are in fundamental conflict, without any showing of parental unfitness. The majority's analysis calls such statutes into question.
Similarly, in In re Welfare of Key, 119 Wash.2d 600, 836 P.2d 200, cert. denied, 507 *35 U.S. 927, 113 S.Ct. 1302, 122 L.Ed.2d 691 (1993), in the context of a dependency hearing, we rejected the natural parent's assertion that, absent a finding of parental unfitness, the court's finding that the handicapped daughter is dependent violated the mother's due process rights. Applying the Sumey balancing test, we held a finding of unfitness was not required in a dependency proceeding, noting:
Ms. Key's interest is the same as that of any parent in a dependency proceeding. Her interest does not depend on whether she is found unfit. Instead, the presence or absence of unfitness would seem to affect only the weight of the State's interest.

Key, 119 Wash.2d at 611, 836 P.2d 200 (emphasis added). Thus, even in a dependency proceeding, again a more severe abridgment of parental rights than that possible under the visitation statutes at issue here, unfitness is not a threshold trigger for exercise of the State's parens patriae power. Both parental unfitness and harm to the child speak rather to the allowable degree of abridgment of parental rights which the state may impose in exercising its parens patriae power.[1]
Likewise, even in custody cases, the best interests of the child govern and unfitness is not a prerequisite for the state to exercise its parens patriae power to act on behalf of the child's welfare. In In re Marriage of Allen, 28 Wash.App. 637, 626 P.2d 16 (1981), a dissolution custody case in which the Court of Appeals affirmed the trial court's award of custody to the step mother of a 7-year-old deaf son born of the father's prior marriage based on the stepmother's extraordinary measures to aid the child, the Court of Appeals held a custody proceeding required a middle ground.
[T]o give custody to a nonparent there must be more than the "best interests of the child" involved, but less than a showing of unfitness. In extraordinary circumstances, where placing the child with an otherwise fit parent would be detrimental to the child, the parent's right to custody is outweighed by the state's interest in the child's welfare. There must be a showing of actual detriment to the child, something greater than the comparative and balancing analyses of the "best interests of the child" test. Precisely what might outweigh parental rights must be determined on a case-by-case basis. But unfitness of the parent need not be shown.

Allen, 28 Wash.App. at 649, 626 P.2d 16 (emphasis added). Thus, even in a custody proceeding unfitness of a parent need not necessarily be shown. Each case is unique, save for the overarching principle that the welfare of the child is the paramount concern.
The majority's position that, absent a threshold finding of parental unfitness or harm to the child, no intrusion on parental rights, no matter how slight, may be undertaken by the State as parens patriae acting on the child's behalf, cannot be reconciled with the above case law.
The majority also goes too far in claiming "the Supreme Court cases which support the constitutional right to rear one's child and the right to family privacy indicate that the state may interfere only `if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burden.' Yoder, 406 U.S. at 234, 92 S.Ct. 1526." Majority op. at 29 (emphasis added). The cited case does not so hold. In Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court held the Free Exercise Clause of the First Amendment barred the application of compulsory school attendance law to Old Order Amish who did not send their children to school after the eighth grade because "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free *36 exercise of religion." 406 U.S. at 215, 92 S.Ct. at 1533. Yoder turns on the free exercise claim asserted by the Amish parents and the unique facts of that case. The Supreme Court held where the interests of parents was combined with a free exercise claim of the nature present in that case, the state must show a compelling interest in requiring Amish parents to send their children to school beyond the eighth grade contrary to their religious beliefs. Referencing Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), however, the Court went on to note that even where such greater justification for state action is required in light of the Amish parent's free exercise claim, parental action threatening harm to the child would not be tolerated.
To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under Prince if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.
Yoder, 406 U.S. at 233-34, 92 S.Ct. 1526. Thus, the Supreme Court in Yoder did not hold that harm is a threshold requirement for any encroachment upon parental rights, as the majority implies; but rather notes even where the circumstances of a particular case provide heightened protections for parental rights, the extreme circumstance of harm to the child clearly justifies state intervention. Accord Prince, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645.
Likewise, the majority errs in concluding "[i]t is clear from Supreme Court precedent that some harm threatens the child's welfare before the state may constitutionally interfere with a parent's right to rear his or her child[,]" citing Prince, 321 U.S. at 170, 64 S.Ct. 438. Majority op. at 29. In Prince, the Supreme Court upheld, against assertions of free exercise and parental control, application of Massachusetts' child labor law prohibiting girls under 18 from selling publications (here religious literature) on the streets, finding the state's power to protect the child from harm was not diminished by the presence or direction of the child's guardian. The exact parameters of the state's power to intrude into parental rights/free exercise were not discussed.[2] Regarding the limits of state power, the Court held only "the rightful boundary of [the state's] power has not been crossed in this case" and noting "[o]ur ruling does not extend beyond the facts the case presents." Prince, 321 U.S. at 170-71, 64 S.Ct. 438. Although Prince indicates state intervention in areas of religious practices or parental control is appropriate to prevent harm to a child, that case does not suggest harm to a child is a threshold requirement for any and all types of state encroachment of parental rights.
C. Grandparent Visitation Cases
Cases concerning the constitutionality of grandparent visitation statutes are also instructive as they address the constitutional legitimacy of intrusions into parental rights. The majority mentions only two such cases, Hawk v. Hawk, 855 S.W.2d 573 (Tenn.1993), and Brooks v. Parkerson, 265 Ga. 189, 454 S.E.2d 769, cert. denied, 516 U.S. 942, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995). See Majority op. at 30, 31. Hawk was decided on state constitutional grounds. Hawk, 855 S.W.2d at 582. See also Beagle v. Beagle, 678 So.2d 1271, 1275-76 (Fla.1996) (holding Florida's grandparent visitation statute violative of the enhanced privacy rights found in art. 1, § 23 of the Florida Constitution, which provides privacy protections "broader in scope" than the federal constitution). Given the state constitutional bases of the Hawk and Beagle holdings, they are of little precedential or persuasive value here since the Washington Constitution (art. 1, § 7) affords no greater protection than the minimum protection conveyed by the federal constitution on matters other than search and seizure. See Ramm v. City of Seattle, 66 Wash.App. 15, 27, 830 P.2d 395 (1992). Brooks adopted the reasoning of Hawk but declared Georgia's grandparent visitation statute violative *37 of both the state and federal constitutions. The Brooks majority, relying on termination cases, premised its holding on the notion that the extent of the intrusion upon parental rights to custody and control was irrelevant. No infringement of such rights, regardless of how small, was permissible absent a showing of harm to the child. Brooks, 265 Ga. at 194 n. 6, 454 S.E.2d 769. We rejected such approach in Sumey. Indeed, our pronouncements on parens patriae in Sumey are more in harmony with the Brooks dissent which chided the majority there for its restrictive view, opining:
Following Tennessee's lead, the majority maintains that the State's authority to assert itself as parens patriae "is permissible only where the health or welfare of a child is threatened." Majority, p. 193 [454 S.E.2d 769]. However, in Georgia, the courts have acted as parens patraie when considering such nonthreatening items as a child's name change, and a purported father's petition of legitimation. In Georgia, the exercise of the parens patriae power has always had as its paramount consideration the best interests of the child, and its exercise has become synonymous with the child's best interests and welfare.
Brooks, 265 Ga. at 199-200, 454 S.E.2d 769 (Benham, Presiding J., dissenting).
The majority cites only the minority view and fails to mention cases such as King v. King, 828 S.W.2d 630 (Ky.), cert. denied, 506 U.S. 941, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992), upholding Kentucky's grandparent visitation statute against a federal constitutional challenge. See also Hawk, 855 S.W.2d at 577 n. 1 ("[t]he United States Supreme Court was asked to review the King case on a right-to-privacy theory and declined. The Supreme Court has never entertained a case involving the right to visitation of grandparents or other third parties." (Citation omitted)). In fact, the majority of cases in the United States have upheld grandparent visitation statutes. In upholding the constitutionality of Utah's Grandparent Visitation Statute, the Utah Court of Appeals noted:
the vast majority of courts that have addressed the constitutionality of grandparent visitation statutes authorizing visitation if in the best interest of the child, have upheld those statutes as constitutional. See Sketo v. Brown, 559 So.2d 381, 382 (Fla.App.1990); Bailey v. Menzie, 542 N.E.2d 1015, 1020 (Ind.App.1989); Spradling v. Harris, 13 Kan.App.2d 595, 778 P.2d 365, 368 (1989); King v. King, 828 S.W.2d 630, 631-32 (Ky.), cert. denied, [506 U.S. 941], 113 S.Ct. 378, 121 L.Ed.2d 289 (1992); Herndon v. Tuhey, 857 S.W.2d 203, 208 (Mo.1993) (en banc); Roberts v. Ward, 126 N.H. 388, 493 A.2d 478, 481 (1985); People ex rel. Sibley v. Sheppard, 54 N.Y.2d 320, 445 N.Y.S.2d 420, 423, 429 N.E.2d 1049, 1052 (1981); Deweese v. Crawford, 520 S.W.2d 522, 526 (Tex.App. 1975). While the Tennessee Supreme Court has held that Tennessee's grandparent visitation statute is unconstitutional under the Tennessee Constitution, the court did not decide whether the statute is unconstitutional under the United States Constitution. See Hawk v. Hawk, 855 S.W.2d 573, 582 (Tenn.1993). To date, only Georgia has declared a statute permitting court-ordered grandparent visitation, if in the best interest of the child, to be unconstitutional under the United States Constitution. See Brooks v. Parkerson, 265 Ga. 189, 454 S.E.2d 769, 773-74 (1995).
Campbell v. Campbell, 896 P.2d 635, 644 n. 18 (Utah App.1995).
As with RCW 26.10.160(3) and former RCW 26.09.240, the Kentucky statute at issue in King allowed visitation by nonparents (i.e., grandparents) if in the best interest of the child. Cf. Ky.Rev.Stat. Ann. § 405.021, RCW 26.10.160(3) and former RCW 26.09.240. The denial of certiorari by the Supreme Court suggests the Kentucky Supreme Court correctly determined the application of the similar Kentucky statute did not go too far in intruding into the fundamental rights of parents under the federal constitution. As the Washington Constitution affords no greater protection than the federal constitution in this area, see Ramm v. City of Seattle, 66 Wash.App. 15, 27, 830 P.2d 395, review denied, 120 Wash.2d 1018, 844 P.2d 437 (1992), Washington's similar provisions *38 likewise withstand a constitutional challenge.[3]See also Sightes v. Barker, 684 N.E.2d 224 (Ind.App.) (upholding Indiana's Grandparent Visitation Act against a federal constitutional challenge as a less than substantial encroachment on the parent's rights and a legitimate exercise of the state's parens patriae power where such visitation serves the child's best interests), transfer denied, 690 N.E.2d 1187 (Ind.1997).
Even in the absence of specific statutory authority a court may exercise its parens patriae power to act in the child's best interests regarding visitation matters, as the New Hampshire supreme court in Roberts v. Ward, 126 N.H. 388, 493 A.2d 478 (1985). Recognizing the changing circumstances of modern families, the Roberts court awarded visitation rights to grandparents, over objections of the natural parent, based on the court's equitable powers. While noting the importance of parental rights the court opined:
Parental autonomy is grounded in the assumption that natural parents raise their own children in nuclear families, consisting of a married couple and their children. The family has been seen as the "basic building block" of society. Parental autonomy strengthens the family and the entire social fabric "by encouraging parents to raise their children in the best way they can by making them secure in the knowledge that neither the state nor outside individuals may ordinarily intervene."
The realities of modern living, however, demonstrate that the validity of according almost absolute judicial deference to parental rights has become less compelling as the foundation upon which they are premised, the traditional nuclear family, has eroded.... More varied and complicated family situations arise as divorces, and decisions not to marry, result in single-parent families; as remarriages create step-families; as some parents abandon their children; as others give them to temporary caretakers; and as still others are judged unfit to raise their own children.
One of the frequent consequences, for children, of the decline of the traditional nuclear family is the formation of close personal attachments between them and adults outside of their immediate families. Stepparents, foster parents, grandparents and other caretakers often form close bonds and, in effect, become psychological parents to children whose nuclear families are not intact.
It would be shortsighted indeed, for this court not to recognize the realities and complexities of modern family life, by holding today that a child has no rights, over the objection of a parent, to maintain a *39 close extra-parental relationship which has formed in the absence of a nuclear family.
Roberts, 126 N.H. at 391-92, 493 A.2d 478 (citations omitted). Emphasizing the best interests of the child to be of paramount concern the Roberts court held exercise of the parens patriae power to act in the child's welfare was appropriate here:
... the better view is that the superior court, as an instrumentality of the State, may use its parens patriae power to decide whether the welfare of the child warrants court-ordered visitation with grandparents to whom close personal attachments have been made.
. . . .
In determining whether or not to grant grandparental visitation, the court must consider the best interests of the child. In doing so, it recognizes that it is primarily "the right of the child to ... know her grandparents" which is being protected and not the interests of the grandparents.
Moreover, in balancing the child's rights to know and associate with her grandparents against the parent's right to custodial autonomy, we note that we are dealing here only with visitation rights. "[G]ranting visitation is a far lesser intrusion, or assertion of control, than is an award of custody" and thus not nearly as invasive of parents' rights.
Our holding today is in accord with the position taken by a number of other jurisdictions, which have found non-statutory bases for granting grandparents visitation rights.
Roberts, 126 N.H. at 392-93, 493 A.2d 478 (citations omitted).
D. Sufficiency of the "Best Interest" Standard
Although the majority recognizes that the severing of a meaningful relationship a child enjoys with a nonparent may be harmful to the child,[4] its disposition of this case undermines the opportunity to sustain such relationships. This need not be the case. The faults the majority sees in RCW 26.10.160(3) and former RCW 26.09.240 are more imagined than real. Both RCW 26.10.160(3) and former 26.09.240 provide that the trial court may order visitation rights for a nonparent "when visitation may serve the best interest of the child[,]" but the majority finds this standard insufficient, and faults the statutes for lacking enumerated factors such as a substantial relationship between petitioner and child or consideration of any past abuse of the child by the petitioner. Majority op. at 30-31. However, such factors/considerations are clearly subsumed under the "best interests of the child" determination[5] which is unique in each case. See Washington State Coalition for the Homeless v. Department of Soc. & Health Servs., 133 Wash.2d 894, 931-32, 949 P.2d 1291 (1997) ("Ultimately what is in the best interests of a particular child depends on `a highly factspecific *40 inquiry that cannot be reduced to a mathematical equation.'").[6]
We have long held that trial courts have broad discretion to determine the best interests of a child in cases touching upon a child's welfare, and such determinations are given great deference. In the context of a dependency proceeding, we stated in Aschauer:
While the criteria for establishing the best interests of the child are not capable of specification, each case being largely dependent upon its own facts and circumstances, the proof necessary in order to deprive a person of his or her parental rights must be clear, cogent and convincing. If there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing, an appellate court should not disturb the trial court's findings. Deference paid to the trial judge's advantage in having the witnesses before him is particularly important in deprivation proceedings, when it is borne in mind that continuity in the parent-child relationship, whether the parent figure be the natural parent or not, is increasingly recognized as a significant factor in a child's normal development.
... Courts are always reluctant to deprive parents of rights with respect to their children, and it is particularly sad when the parent cares for the child and desires to be a good parent, as appears to be the case here. However, it is the court's duty to see that those rights yield, when to accord them dominance would be to ignore the needs of the child.

In re Aschauer's Welfare, 93 Wash.2d 689, 695, 611 P.2d 1245 (1980) (citations omitted).
The best interests of the child remain the court's paramount concern. This inquiry is the touchstone by which all other rights are tested and concerns addressed in various contexts dealing with children. See, e.g., Washington State Coalition for the Homeless v. Department of Soc. & Health Servs., 133 Wash.2d 894, 923, 949 P.2d 1291 (1997) ("As in all matters dealing with the welfare of children, the court must additionally act in the best interests of the child."); Aschauer, *41 93 Wash.2d at 695, 611 P.2d 1245 ("This court has repeatedly said that the goal of a dependency hearing is to determine the welfare of the child and his best interests."); In re Sego, 82 Wash.2d 736, 738, 513 P.2d 831 (1973) ("a child's welfare is the court's primary consideration ... when the rights of parents and the welfare of their children are in conflict, the welfare of the minor children must prevail"); In re Marriage of Littlefield, 133 Wash.2d 39, 51-52, 940 P.2d 1362 (1997) (noting in the absence of parental cooperation in a postseparation action, the trial court is given broad discretion to develop and order a parenting plan according to the guidelines set forth in RCW 26.09.187(3) and based upon the best interests of the children at the time of trial); State ex rel. Campbell v. Cook, 86 Wash.App. 761, 771, 938 P.2d 345, review denied, 133 Wash.2d 1019, 948 P.2d 387 (1997) (noting the best interests of the child are paramount in paternity proceedings, the Court of Appeals upheld trial court's denial of the putative father's attempt to reopen/challenge paternity determination made 13 years prior).
While our case law supports use of the "best interest" standard in matters relating to the welfare of children, Judge Ellington's dissent in Troxel deftly explains why this standard is particularly appropriate here:
The statute itself contains the Legislature's standard for both threshold and standing, in its requirement that the visitation serve the best interests of the child.
Many considerations could explain a legislative decision to leave RCW 26.10.160(3) unamended. Grandparent visitation issues come most readily to mind. For if a custody action must be pending before a grandparent may petition, then a grandparent whose child is deadas is the Troxels' sonand who can thus never expect a RCW 26.09 petition opportunity (because no petition will ever be pending under that chapter) also has no recourse under RCW 26.10 unless willing to allege the remaining parent is unfithardly a prelude to amicable relations among family members. Is there never then to be a circumstance where a child indeed has a fit parent, but also has strong ties to grandparents, warm and beneficial ties which the child's best interests call for protecting?
The limitations which public policy may place on such petitions are fertile grounds for debate ... But these are matters for the Legislature, and for now, the current statute expresses one policy approach: any person may petition at any time, so long as the child's best interests are served. It cannot be said that this approach is absurd, or even out of harmony with RCW 26.09.240.

In re Visitation of Troxel, 87 Wash.App. 131, 142-43, 940 P.2d 698 (1997) (Ellington, J., dissenting) (italics and footnotes omitted). Indeed, the broad language of RCW 26.10.160(3) and former RCW 26.09.240 furthers the best interests of the child by tacitly recognizing the growth of nontraditional families and the important role members of such families may play in the child's life.
The best interest standard lacks nothing in its brevity and retains the necessary flexibility required by a trial court in addressing the infinite circumstances and possibilities which surround child welfare determinations such as the nonparent visitation at issue in these cases. We should reiterate the best interests of the child remain the touchstone by which all other rights are tested and concerns addressed in various contexts dealing with children.[7] In the consolidated cases before us, the trial courts in Troxel and Smith entered specific findings that visitation with the petitioners would be in the respective children's best interest. See Troxel Findings of Fact 2.3E, Clerk's Papers at 128; *42 and Smith Findings of Fact 2.17, Clerk's Papers at 6; Conclusions of Law 3.3, Clerk's Papers at 9. The majority ignores these findings.
E. Harassment Suits
The majority also faults the statutes in question for lacking safeguards to prevent stable families from defending in court against frivolous petitions for visitation. Majority op. at 31. This imagined threat is also unfounded. Courts are amply provided with the means of deterring such abuses. See CR 11 (authorizing sanctions, expenses and attorney fees for frivolous claims which may be imposed sua sponte by a trial court); see also RCW 26.10.080 and 26.09.140 (providing for costs and attorney fees at the court's discretion regarding "any proceeding under this chapter").

CONCLUSION
The majority correctly holds the nonparents in these consolidated cases have standing to petition for visitation under the plain language of RCW 26.10.160(3) and former RCW 26.09.240. The majority is incorrect, however, in holding that such visitation, when awarded upon determination of the best interests of the child, impermissibly infringe the rights of parents. Since we have previously approved an encroachment of parental rights of greater magnitude than that possible under the statutes in question, the majority's position is untenable.
In practical terms, the majority would deprive nonparties to custody proceedings in dissolutions from any opportunity to have visitation with a child even where the relationship with the child is significant and in the child's best interest. This is cruel both to the child who may want and need a relationship with grandparents, relatives, and others, and to those third parties, many of whom are the child's blood relatives. I decline to apply such an approach that is oblivious to the varied relationships that flourish in our society.
As the requisite finding of best interest of the child has been made in Troxel and Smith, the trial courts' orders granting visitation should be reinstated/affirmed. Because the trial court in Wolcott found petitioner Clay to have no standing under a theory we reject, and did not reach the issue of best interest of the child, that case should be remanded for further proceedings including a determination regarding the best interest of the child. I would reverse the Court of Appeals in Wolcott and remand for further proceedings, reverse the Court of Appeals in Troxel and reinstate the trial court's order, and affirm the trial court in Smith.
DURHAM, C.J., and GUY and ALEXANDER, JJ., concur.
NOTES
[1] The trial court found that the petition for visitation was governed by the version of RCW 26.09.240 that was in effect when their action was filed on April 3, 1996. The court held that the language added to the statute by the 1996 amendment was not applicable since the amendment was not effective until June 6, 1996.
[2] Provisions in former RCW 13.32 have been supplanted by provisions in RCW 13.32A.
[3] The residential placement was temporary. A review hearing had to be held every six months to approve or disapprove of the continuation of the placement. RCW 13.32.050, repealed by Laws of 1979, ch. 155, § 86. Throughout the six month period appropriate interim services were provided to the child and parents with the ultimate goal of reunification. Id.
[4] We note that the court in Sumey did not engage in a strict scrutiny analysis although it recognized that a parent's fundamental right to the "care, custody, and companionship" was at stake. In re the Welfare of Sumey, 94 Wash.2d 757, 762, 621 P.2d 108 (1980). The court instead, without citation to authority, engaged in a balancing analysis weighing the interests of the parents against the parens patriae power of the state. Id. at 763, 621 P.2d 108. Nevertheless, the court's result was correct because the interests of the state in that case, as discussed above, were compelling and the statute was narrowly tailored to serve the state's interest.
[5] Ms. Stillwell asks for attorneys fees and costs on appeal pursuant to RCW 26.09.240(3). Ms. Stillwell cannot receive attorneys fees pursuant to RCW 26.09.240(3) as it was not in effect at the time the petition for custody was filed and there is not indication that the Legislature intended the amended provisions of the statute to be applied retroactively.
[1] Thus the majority's reliance on Sumey in asserting "[t]his court has emphasized that a state can only intrude upon a family's integrity pursuant to its parens patriae right when `parental actions or decisions seriously conflict with the physical or mental health of the child[,]'" Majority op. at 29 (emphasis added), is misplaced. Indeed, recognizing that the State has not merely a right, but the responsibility to intervene when the severe circumstance of harm to the child is present is the starting point of Sumey's parens patriae analysis. It does not end there however, as the above discussion explains. See Sumey, 94 Wash.2d at 762-65, 621 P.2d 108.
[2] After noting the "custody, care and nurture of the child reside first in the parents," the Court went on to hold "neither rights of religion nor rights of parenthood are beyond limitation ... the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare[.]" Prince, 321 U.S. at 161-67, 64 S.Ct. 438 (citations omitted).
[3] The majority has correctly refrained from an analysis based on state constitutional grounds as urged by appellant Stillwell who asserted "[a]rticle 1, § 7 of the Washington Constitution mandates greater protection of the `private affairs' of the family under the six ... factors ... in State v. Gunwall, 106 Wash.2d 54, 61-62, 720 P.2d 808 (1986)[,]" Br. of Appellant at 14-18. This argument was rejected in Ramm v. City of Seattle, 66 Wash.App. 15, 23-27, 830 P.2d 395, review denied, 120 Wash.2d 1018, 844 P.2d 437 (1992), wherein the Court of Appeals held:

Our examination of the six Gunwall factors persuades us that, on matters not involving search and seizure, Const. art. 1, § 7 affords no greater protection than the minimum protection afforded by the federal constitutional analysis.
Ramm, 66 Wash.App. at 27, 830 P.2d 395 (emphasis added). Stillwell cites In re Detention of D.A.H., 84 Wash.App. 102, 110, 924 P.2d 49 (1996), for the proposition that our state constitution provides greater privacy protection than the expectations created by the Fourth Amendment. Reply Br. of Appellant at 9. D.A.H. relies, however, on a search and seizure case, State v. Boland, 115 Wash.2d 571, 577-78, 800 P.2d 1112 (1990), for that statement and failed to recognize the distinction between autonomy and search and seizure cases as Ramm does. See Ramm, 66 Wash.App. at 23-27, 830 P.2d 395, discussing Boland.
Stillwell also misstates Beagle v. Beagle, 678 So.2d 1271 (Fla.1996); which found the Florida grandparent visitation statute violative of the state constitution, asserting the case to note "Washington's Constitution provides express privacy protections similar to those relied upon by the Florida Supreme Court. 678 So.2d at 1275 n. 9." Br of Appellant at 18. However, in Beagle, the Florida court actually notes the Florida Constitution provides greater privacy protection than the federal constitution and lists Washington among states which include privacy protections in their search and seizure constitutional provisions. See Beagle, 678 So.2d at 1275 & n. 9. This interpretation comports with the Ramm holding (cited above) noting heightened protection regarding searches and seizures only.
[4] "We recognize that in certain circumstances where a child has enjoyed a substantial relationship with a third person, arbitrarily depriving the child of the relationship could cause severe psychological harm to the child." Majority op. at 30.
[5] Although it appears the majority would be more comfortable with an enumeration of "best interest" factors such as those appearing in the current version of RCW 26.09.240(6), even that statute makes clear that such enumeration is illustrative only. See RCW 26.09.240(6) ("The court may consider the following factors when making a determination of the child's best interests:") (emphasis added) and .240(6)(h) ("Any other factor relevant to the child's best interest."). RCW 26.09.240(6) states in full:

(6) The court may consider the following factors when making a determination of the child's best interests:
(a) The strength of the relationship between the child and the petitioner;
(b) The relationship between each of the child's parents or the person with whom the child is residing and the petitioner;
(c) The nature and reason for either parent's objection to granting the petitioner visitation;
(d) The effect that granting visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;
(e) The residential time sharing arrangements between the parents;
(f) The good faith of the petitioner;
(g) Any criminal history or history of physical, emotional, or sexual abuse or neglect by the petitioner; and
h) Any other factor relevant to the child's best interest.
[6] Should a listing of "best interest" factors be necessary, as the majority insists, we are not without authority to provide them. Again, the New Hampshire supreme court's approach in Roberts is instructive. Like the majority here, the Roberts court recognized the importance of continuity and stability in children's close relationships, Roberts, 126 N.H. at 392-93, 493 A.2d 478, and, relying on its equity powers, established six factors to be considered when acting in the child's best interests when considering a petition for visitation by grandparents.

Factors which the court may consider in determining whether or not to grant grandparental visitation include: [1] whether the child has lived with the grandparents and the length of that residence; [2] whether the grandparents have stood in loco parentis to the child; [3] the effect on the child's physical and emotional health engendered by visitation or lack of it; [4] the circumstances which resulted in the absence of a nuclear family; and [5] the child's preference regarding visitation.... [6] The fact that there is friction between the parents and grandparents will not in and of itself preclude granting visitation rights but may be considered among all the surrounding circumstances.
Roberts, 126 N.H. at 394, 493 A.2d 478 (citations omitted). Substituting "petitioner" for "grandparents" in the above criteria would provide the factors the majority seeks, and like the New Hampshire supreme court, we may provide trial courts with guiding considerations in matters concerning a child's well-being. See In re Dependency of J.B.S., 123 Wash.2d 1, 11, 863 P.2d 1344 (1993) (holding the best interests of the child prevail when the rights of parent and child conflict, and providing guiding considerations for the trial court in the event of a future motion for change of placement). Any such enumeration of factors, however, would be illustrative only, and subsumed under the "best interest" standard in any event. Such listing is therefore unnecessary. Under the umbrella of the best interest standard a trial court considers the unique circumstances of each case when deciding issues affecting a child's welfare. As we stated in the dependency case of In re Welfare of Becker, 87 Wash.2d 470, 477-78, 553 P.2d 1339 (1976):
While our statutes and judicial opinions may set forth the goal, the criteria for establishing the best interests for the welfare of the child are conspicuous by their absence. The complexity of the cases and the need for careful individual treatment militates against the mandatory consideration of certain specified factors in every case. Nevertheless, the courts have broad discretion and are allowed considerable flexibility to receive and evaluate all relevant evidence in reaching a decision that recognizes both the welfare of the child and parental rights.
(Citations omitted.)
[7] See Beagle v. Beagle, 678 So.2d 1271, 1275 (Fla.1996). While finding the Florida grandparent visitation statute violative of the state constitution, the Florida Supreme Court acknowledged other states had upheld their grandparent visitation statutes against federal constitutional challenges, noting: "[i]n those cases a best interest standard was deemed to be sufficient." Id. at 1275 (citing Herndon v. Tuhey, 857 S.W.2d 203 (Mo.1993); Lehrer v. Davis, 214 Conn. 232, 571 A.2d 691 (1990); Bailey v. Menzie, 542 N.E.2d 1015 (Ind.Ct.App.1989); Spradling v. Harris, 13 Kan.App.2d 595, 778 P.2d 365 (1989); King v. King, 828 S.W.2d 630 (Ky.), cert. denied, 506 U.S. 941, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992); Ridenour v. Ridenour, 120 N.M. 352, 901 P.2d 770 (Ct.App.), cert. denied, 120 N.M. 68, 898 P.2d 120 (1995)).