RENDERED: MARCH 25, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0563-MR

MICHAEL WAYNE HOSKINS                                    APPELLANT

APPEAL FROM BELL CIRCUIT COURT
v.            HONORABLE ROBERT V. COSTANZO, JUDGE
ACTION NO. 17-CI-00343

CHRISTY M. ELLIOTT AND
BRITTANY SMITH                                              APPELLEES

OPINION
REVERSING

** ** ** ** **

BEFORE: ACREE, DIXON, AND McNEILL, JUDGES.

ACREE, JUDGE: Michael Hoskins (Father) appeals the Bell Circuit Court order

granting Christy Elliott (Elliott) visitation with Father's minor son (Child). Child's

mother, Brittany Smith (Mother), waived participation in this custody and

visitation dispute. We reverse.

For a second time, this Court is reviewing an order adjudicating the

parties' rights *vis-à-vis* Child. In 2019, we rendered *Hoskins v. Elliott*, reversing

an order granting custody of Child to Elliott and allowing Father visitation. 591 S.W.3d 858 (Ky. App. 2019) (*Hoskins I*). We noted then that, "under the Fourteenth Amendment of the United States Constitution, a parent, who is not unfit, has the fundamental right to make decisions as to the care, custody, and control of his or her child." *Id.* at 861 (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000)). Father is not unfit.

This Court further held "Elliott lacked the proper standing to seek custody . . . ." *Id.* at 864. "We reverse[d] the Bell Circuit Court's January 30, 2018, order and remand[ed] the matter for reconsideration of the issues of custody and visitation." *Id.*

On remand, the circuit court awarded sole custody to Father. However, the circuit court also ordered Father to allow Elliott visitation with Child by applying a best-interests analysis.[1] Father appeals that visitation award.

Although courts often cite the Supreme Court of the United States' opinion in *Troxel v. Granville*, *supra*, for the bromide that a fit parent has the constitutionally protected right to raise his or her child, they seldom consider or explain why that is so. *See, e.g.*, *Hoskins I*, 591 S.W.3d at 861-62. *But see Pinto v. Robison*, 607 S.W.3d 669, 672-678 (Ky. 2020) (explaining *Troxel* and finding

---

[1] The order awarded Elliott visitation: (1) one weekend per month and every third Wednesday for two hours; (2) from 2:00 PM till 7:00 PM on Christmas Day; (3) part of the Thanksgiving weekend; and (4) from 6:00 PM to 8:00 PM on Child's birthday.

Kentucky's grandparent visitation statute unconstitutional for a second time). This second review of Father's case is well-suited to do that, to drill down in *Troxel* to its core principles with a precision and utility unattainable by a mere conclusory recitation of the constitutional right, such as appeared in *Hoskins I*.

We start our review by quoting the circuit court. Reduced to its essence, the circuit court's order includes two constitutionally incompatible paragraphs: (1) Elliott "failed to show . . . [Father] is an unfit parent[;]" and (2) "the child's best interest . . . will continue to be served" by granting visitation rights to Elliott against Father's wishes. *Troxel* makes it clear: a fit parent gets to decide who is allowed visitation with his child and, absent extraordinary circumstances which certainly are not shown by this record, a court order superseding a fit parent's decision regarding visitation constitutes undue state interference with that parent's constitutionally protected right to make the decision himself. *Troxel*, 530 U.S. at 60-75, 120 S. Ct. at 2057-65.

In *Troxel*, Washington state law authorized a trial court to grant visitation rights to any person "whenever 'visitation may serve the best interest of the child.'" *Id.* at 60, 120 S. Ct. at 2057 (citation omitted). Grandparents in that case petitioned for visitation of two grandchildren. The sole custodial parent opposed the petition claiming a court order of visitation contrary to a fit parent's will "unconstitutionally interferes with the fundamental right of parents to rear

their children." *Id.* Rejecting that argument, the trial court found visitation was in the children's best interest because:

> The Petitioners [the grandparents] are part of a large, central, loving family, all located in this area, and the Petitioners can provide opportunities for the children in the areas of cousins and music.
>
> . . . The court took into consideration all factors regarding the best interest of the children and considered all the testimony before it. The children would be benefitted from spending quality time with the Petitioners, provided that that time is balanced with time with the childrens' [*sic*] nuclear family. . . .

*Id.* at 61-62, 120 S. Ct. at 2058.

The Washington Supreme Court reversed the trial court and "rested its decision on the Federal Constitution[,]" stating, "It is not within the province of the state to make significant decisions concerning the custody of children merely because it could make a 'better' decision." *Id.* at 63, 120 S. Ct. at 2058-59 (quoting *In re Custody of Smith*, 969 P.2d 21, 31 (Wash. 1998)). "'[P]arents have a right to limit visitation of their children with third persons,' and . . . between parents and judges, 'the parents should be the ones to choose whether to expose their children to certain people or ideas.'" *Id.* at 63, 120 S. Ct. at 2059 (quoting *Smith*, 969 P.2d at 31).

The Supreme Court of the United States granted *certiorari* and affirmed the Washington Supreme Court. In doing so, the Court identified foundational principles specifically applicable to the very case now under review.

*Troxel* begins with a lengthy recitation of the source and history of the overarching principle, which it summarized as follows: "[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." 530 U.S. at 66, 120 S. Ct. at 2060. This fundamental right is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65, 120 S. Ct. at 2060. It entitles a parent to "heightened protection against government interference . . . ." *Id.* (citations omitted).

*Troxel* also reminds us of the state's relationship to children, stating, "[t]he child is not the mere creature of the State . . . ." *Id.* (citations omitted). To be clear, and as the Supreme Court emphasized, when it comes to "the upbringing and education of children[,]" the state is inferior to fit "parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 65-66, 120 S. Ct. at 2060 (citations omitted).

The Supreme Court further recognized the greatest threat to this fundamental right is the power of the state, as is so with all constitutionally

-5-

recognized rights. What *Troxel* says about a court's abuse of such state power applies specifically in this case.

If the state allows any person with a connection to a child to petition for visitation based on the child's best interest, said the Court, it "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." *Id.* at 67, 120 S. Ct. at 2061. Both the circuit court here and the trial court in *Troxel* chose not to yield any of its considerable state authority to the parent's constitutional right. That failure to yield power is shown by the fact that in both cases "[the] parent's decision that visitation would not be in the child's best interest [wa]s accorded no deference." *Id.* Just as in *Troxel*, the lower court here proceeded on the erroneous belief that, under such facts as these, the law "places the best-interest determination solely in the hands of the judge." *Id.*

The Supreme Court derided the consequence of disregarding the fit parent's superior right in favor of a best-interests analysis, stating:

> Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, . . . a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests.

-6-

*Id.* (emphasis in original). That is what occurred in the case now before us. That is why the grant of visitation must be reversed just as it was in *Troxel*.

But this case and *Troxel* continue even further down a parallel course.

> [T]he record reveals that the [trial c]ourt's order was based on precisely the type of mere disagreement [between parent and judge] we have just described and nothing more. The [trial c]ourt's order was not founded on any special factors that might justify the State's interference with [the parent's] fundamental right to make decisions concerning the rearing of h[is child].

*Id*. at 68, 120 S. Ct. at 2061. The "special factors" to which the Supreme Court refers are those that support terminating parental rights, like unfitness or waiver, or those that support curtailing those rights as in a case of dependency, neglect, or abuse. None of these factors can be found in the record of this case.

In *Troxel*, the equities favoring nonparent visitation were even stronger than in the case now before this Court because the visitation petitioners were related by blood. "To be sure," said the Supreme Court of the United States, "this case involves a visitation petition filed by grandparents soon after the death of their son – the father of [the children] . . . ." *Id*. And still, from here to the end of the *Troxel* opinion, the analysis applies directly, notwithstanding the more tenuous, nonrelative connection between Child and Elliott.

Just as "[t]he decisional framework employed by the [Washington trial court] directly contravened the traditional presumption that a fit parent will act

in the best interest of his or her child[,]" *id.* at 69, 120 S. Ct. at 2062, the Bell

Circuit Court directly contravened the same traditional presumption to which

Father is entitled. As in *Troxel*, "no court has found[] that [Father] was an unfit

parent." *Id.* at 68, 120 S. Ct. at 2061. "That aspect of the case is important, for

there is a presumption that fit parents act in the best interests of their children." *Id.*

The guiding principle, one that should be committed to every jurist's

memory, is thus stated by the Supreme Court in the strongest of terms, as follows:

> [S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

*Troxel*, 530 U.S. at 68-69, 120 S. Ct. at 2061. The Bell Circuit Court violated this

principle by presuming a greater right to determine what is in Father's child's best

interest than Father himself. "In that respect, the court's presumption failed to

provide any protection for [Father's] fundamental constitutional right to make

decisions concerning the rearing of h[is] own [child]." *Id.* at 69-70, 120 S. Ct. at

2062.

In *Troxel*, as noted above, visitation was sought by the child's blood

relatives – paternal grandparents. If *Troxel*'s principles apply to them, how much

more vigorously must they apply to a person not related by blood or affinity?

Regarding the right of grandparent visitation, the Supreme Court said:

> In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it *the decision* whether such an intergenerational relationship would be beneficial *in any specific case is for the parent to make in the first instance*.

*Id.* at 70, 120 S. Ct. at 2062 (emphasis added). As completely as this principle applies to grandparents, so too it must apply to nonrelatives like Elliott.

Furthermore, this Court does not find the Bell Circuit Court's factfinding substantively distinguishable from that in *Troxel*, set forth above, and which the Supreme Court called "slender findings." *See id*. at 72, 120 S. Ct. at 2063. Facts found in this case are not more substantial. They say a bond formed while Elliott provided for Child's needs. But caring for Child's needs was a responsibility compelled by the circuit court's erroneous temporary custody order this Court reversed. *Hoskins I*, 591 S.W.3d at 861.

Whatever bond may exist or has ever existed between Child and Elliott formed because, before the child was one and one-half years old, the circuit court erroneously granted custody to a nonrelative instead of Child's fit parent. *Id.* at 860. That was the first time the circuit court used state authority to unduly interfere with Father's constitutional right. When reversing that order, this Court began its analysis by directly referencing *Troxel*'s applicability, saying:

> In 2000, the United States Supreme Court affirmed longstanding, nationwide precedent that under the Fourteenth Amendment of the United States Constitution,

-9-

> a parent, who is not unfit, has the fundamental right to make decisions as to the care, custody, and control of his or her child. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000). The Court went so far as to say that "[t]he liberty interest at issue in th[at] case – the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* Father argues this right was trampled upon . . . . We agree.

*Id.* at 861-62 (footnote omitted). On remand, the circuit court again trampled upon Father's constitutionally protected fundamental right to raise Child.

The circumstance with which this Court is now presented calls to mind the proverb that you can lead a horse to water but can't make him drink. After being directed to *Troxel* when this case was remanded, the circuit court still demonstrated it lacked an understanding of the opinion's sound principles. How wrong can we be then that at least some of our courts need a *Troxel* refresher?

When the circuit court ordered visitation in favor of Elliott, it again abused the state's power to unduly interfere with the constitutionally recognized fundamental right of a fit parent, Father, to raise his son as he deems to be in his son's best interest.

For the foregoing reasons, we reverse that portion of the Bell Circuit Court's April 6, 2020 order granting visitation to Elliott.

DIXON, JUDGE, CONCURS.

McNEILL, JUDGE, CONCURS IN RESULT ONLY AND FILES SEPARATE OPINION.

McNEILL, JUDGE, CONCURRING: The majority correctly determined that Elliott has no right to visitation. However, I disagree with the majority's analysis. Therefore, for the following reasons, I respectfully concur in result only.

First, the majority either omits or underemphasizes the unique procedural and factual record at issue here. It is undisputed that Child's Mother has abandoned him. Furthermore, it is alleged in the pleadings and during the underlying hearing that Father has multiple children for which he cannot provide, as well as an extensive criminal history including domestic violence and assault. As memorialized in a previous published decision by this Court, the Cabinet for Health and Family Services (the Cabinet) became involved in this case as follows:

> On February 11, 2017, when Child was nine months old, Mother left Child with her friend, Elliott. She would testify eventually that she wanted Elliott to babysit Child for the weekend, and until she had made scheduled court appearances. (Video Record (VR) 6/11/2018 00:23:21-00:23:57). Intervening events thwarted that plan.
>
> Father later showed up at Elliott's home believing he would find both Child and Mother. Because Father seemed to be under the influence of methamphetamines, Elliott would not relinquish Child to his care. Three days later, Mother still had not returned. Child became sick and Elliott had no authority to arrange medical care. She was unable to locate Mother and did not have legal custody enabling her to take Child to the doctor. The

-11-

Cabinet for Health and Family Services then became involved.

The Cabinet's investigation led to a dependency, neglect, or abuse (DNA) petition, naming Mother as the person believed to be responsible for the abuse or neglect. The Cabinet's petition for temporary removal of the Child from Mother's custody was filed on February 15, 2017, in Bell District Court, No. 17-J-00020-001 (the "Juvenile Case"). The petition states that DCBS, the Cabinet's Department for Community Based Services, allowed Elliott "to keep children at this time . . . ." (Juvenile Case, Record (R.) 4).

Father was not implicated by any claim of abuse or neglect of Child. Nevertheless, DCBS and the Cabinet did not consider him for placement because he had drug addiction and domestic violence issues. After an adjudication hearing on March 2, 2017, the circuit court found Child neglected or abused by Mother and ordered Child to remain with Elliott. The dispositional hearing on April 20, 2017, concluded similarly that Child was to remain with Elliott.

Throughout the entire DNA action, the Cabinet never indicated that Father violated the DNA statutes. Still, Father: (1) appeared at every hearing; (2) was appointed counsel to represent him; and (3) worked the case plan the Cabinet provided to him. The case plan required Father to attend drug screens, anger management, and parenting classes. Eventually, Father completed his case plan despite, technically, not being before the circuit court in the DNA action.

*Hoskins v. Elliott*, 591 S.W.3d 858, 860-61 (Ky. App. 2019) (footnotes omitted)

(hereafter referred to as "*Hoskins I*"). In summary, Mother abandons Child, Father

shows up high to retrieve Child from the safety of Elliott's care. The Cabinet

-12-

becomes involved. A DNA action proceeds. Father is afforded the process he is due, and ultimately prevails as Child's sole custodian. However, intervening events are worth discussing.

The Court of Appeals in *Hoskins I* ultimately reversed the circuit court due to Elliott's lack of standing under the *de facto* custodian statute, KRS[2] 403.270(1)(a). More specifically, the Court held that although Elliott may have qualified as Child's primary caregiver, the child did not reside with her for the requisite amount of time provided under the statute. *Hoskins I*, 591 S.W.3d at 863-64. On remand, the circuit court held a hearing to further determine custody and visitation rights of the parties pursuant to the Court of Appeals' decision in *Hoskins I*. The circuit court subsequently issued an order granting Father sole custody of Child, and awarding Elliott visitation rights. A visitation schedule accompanied the court's order. In so holding, the circuit court reasoned as follows:

> For the vast majority of [Child's] life, [Elliott] has made certain that the needs of [Child] have been met. She has provided food, clothing, shelter, medical care, love, affection, and psychological support for [Child]. [Elliott] has made certain that [Child] was able to maintain one on one contact with his sibling sister . . . . [Elliott's] motivation has been to ensure that [Child's] best interests are best served. **Clearly [Elliott] has developed very strong bonds with [Child] which if severed would cause great harm to his mental and possible physical health. The Court is mindful that the circumstances**

---

[2] Kentucky Revised Statutes.

-13-

**which caused [Child] to be placed with [Elliott] was due to [Father's] bad behavior**.

(Emphasis added.) This is a far cry from what the majority analogizes to the "slender findings" referenced in *Troxel*. Rather, the girth of the findings at issue here is noteworthy and should not ring hollow. To reiterate, the circuit court initially granted Elliott, a nonparent, *permanent* custody of Child and awarded Father *supervised* visitation. *See Hoskins I*, 591 S.W.3d at 861. After being reversed and on remand, the same court awarded Elliott visitation. One need not be a mind reader to intuit the court's concerns here. Having reviewed the record in this case, including the extremely contentious hearing underlying the present issues, such concerns become acute. Nevertheless, I concede that the circuit court erred as a matter of law and that reversal is required for the following reason.

The only statute potentially relevant here concerning visitation is KRS 403.320. And although not specifically cited by the circuit court, discussion of this provision does nothing to weaken the majority's analysis. In fact, it provides clarity in a somewhat novel case and may prove useful to the bench and bar. KRS 403.320(4) provides:

> Under circumstances where the court finds, by clear and convincing evidence, it is in the best interest of the child, **any relative, by blood or affinity**, that was previously granted temporary custody pursuant to the provisions of KRS 620.090 may be granted reasonable noncustodial parental visitation rights by a Circuit Court or Family Court as an intervenor or by original action.

-14-

(Emphasis added.) As previously stated, Elliott was a friend of Child's Mother. Therefore, Elliott is certainly not a blood relative. Although "affinity" is not defined in KRS Chapter 403 or in any other relevant statutory provision as far as the Court can discern, it is discussed in *Wolfe v. Commonwealth*, 229 Ky. 385, 387, 17 S.W.2d 219, 220 (1929), and defined in Black's Law Dictionary. *See Affinity*, BLACK'S LAW DICTIONARY (11th ed. 2019). However, it is unnecessary to belabor the definition of affinity because there is no indication here that Elliott is Child's "relative" in any sense. It is not within the purview of this Court to expand the scope of the visitation statutes. That discretion is vested in our General Assembly. In Ohio, for example, the legislature has determined that under certain circumstances "the court may grant reasonable companionship or visitation rights to any grandparent, any person related to the child by consanguinity or affinity, **or any other person other than a parent** . . . ." Ohio Revised Code § 3109.051(B)(1) (emphasis added).

Lastly, the majority emphasizes what it describes as Father's "fitness," as though it negates even the *possibility* of any additional proceedings. Simply put, the use of "fitness" in the present context strains the meaning of the

word.[3]  Furthermore, and most critically for our purposes, parental "fitness" does not obviate visitation.  This includes the potential visitation rights of nonparents.  *See* KRS 403.320(4); and KRS 405.021 (grandparent visitation).  For example, if Elliott was Child's relation by blood or affinity, the circuit court would be well-within its discretion to award her visitation rights under KRS 403.320(4).  There is nothing in *Troxel* that would command a contrary result.  Indeed, barring some constitutional infirmity that has not been argued here, there is nothing in KRS Chapters 403, 405, or any other relevant provisions of our domestic code that offends *Troxel*'s central holding.  *See* 16 LOUISE EVERETT GRAHAM & JAMES E. KELLER, KY. PRAC. DOMESTIC RELATIONS L. § 22:2 *Visitation – Persons entitled*; and § 22:4 *Visitation – Standards for awarding – Grandparent* (2021).

The present case exposes many things, an all too familiar family tragedy, an error of law, *etc*.  What it does not yield is a gross abuse of state power as the majority would infer.  Therefore, while I concur with the majority's ultimate result, I do so with fidelity to our United States Constitution, but also in consideration of the laws enacted by our duly elected General Assembly, and with the utmost respect for our family courts – of whom much is expected; and to those whose lives are forever altered by their decisions – to whom much is owed.

---

[3] Although somewhat trivial considering the additional concerns at issue here, when asked by the judge to spell his live-in girlfriend's name, Father was unable to do so.  Not so trivial, however, is Father's testimony that she was Child's caretaker while Father was at work.

-16-

BRIEF FOR APPELLANT:

Levi Z. Turner
Middlesboro, Kentucky

BRIEF FOR APPELLEE CHRISTY
M. ELLIOTT:

Brandon West
Barbourville, Kentucky