IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| AMINA J. CONDEL, | No. 84310-9-I |
| Respondent, | DIVISION ONE |
| v. | |
| FRANK GARRETT CONDEL, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — Amina and Frank Garrett Condel[1] married in 1999 and have four children together.  After enduring years of abuse, Amina petitioned for a domestic violence protection order (DVPO) for herself and their children.  After a contested hearing, a court commissioner granted her petition, entered a DVPO, and ordered Garrett to surrender any weapons and attend a domestic violence treatment program.  The commissioner denied Garrett's motion for reconsideration and a judge denied his motion for revision.  On appeal, Garrett raises a number of challenges, both procedural and substantive.  Finding no merit in his contentions, we affirm.

FACTS

Amina and Garrett Condel married in 1999 and have four children together: B.C., G.C., J.C., and L.C.  Three of the children are minors and L.C. is an adult with autism, dependent on her parents for care.

---

[1] For clarity, we refer to the parties by their preferred first names—in Mr. Condel's case, his middle name—because they share a last name.

Soon after the parties married, Garrett became physically and psychologically abusive toward Amina. His behavior escalated over the years to eventually involve the parties' children. Garrett's aggressive behavior caused Amina to "live in extreme fear for [her] life and [the] children's lives." Amina's situation only worsened with the onset of the COVID-19[2] pandemic. Forced to remain at home with Garrett, his controlling and abusive behavior became unbearable.

In March 2022, Amina petitioned for a domestic violence protection order (DVPO) for herself and the children. Amina's declaration in support of the DVPO detailed years of abuse directed at her and the children. She stated that Garrett first became aggressive during their first year of marriage and that when Garrett got upset, "he would often wrap his arms around [Amina] and physically hold [her] against her will . . . so that [she] could not move or escape." She described that over the years, Garrett habitually abused her, calling her crude names and being generally demeaning. She also alleged that Garrett used "threatening body language to intimidate [her]," including charging after her and putting his face aggressively close to hers.

On July 17, 2019, in what Amina described as "[o]ne of the scariest incidents," Garrett "slapped [her] hand with so much force that his finger jabbed into [Amina's] eye and [her] head slammed backwards and struck the frame of [her] bedroom door." Amina experienced eye pain "non-stop" for a month and

---

[2] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

received medical care for her eye and head injuries.

Amina recounted several incidents of violence against her witnessed by the children. For example, in November 2019, when Amina asked G.C. to leave the garage to go to bed, Garrett "came charging toward the door and slammed the door on [Amina's] right arm and side." And in March 2020, during an argument about finances, Garrett suddenly "sprung up from his chair and the chair slammed down hard on [Amina's] foot." Amina cried out in pain and the children "ran to [her] to see if [she] was ok, and [Amina] cried for several minutes."

Amina's declaration also contained several examples of violence directed towards the parties' children. For instance, in March 2018, Garrett "got physically aggressive with GC by slapping his leg." A few days later, "Garrett became physically aggressive with LC by slapping, grabbing and being rough with her and scaring her to the point where she was shaking and crying." In total, Amina's declaration contained more than 20 accounts of violence towards her or the children.

Garrett denied committing any acts of violence towards Amina or the children and claimed that "notwithstanding her hyperbolic melodrama, Amina has never been frightened of [him] in any way whatsoever." Garrett noted that while he had been raised "in a loving family with no exposure to domestic violence," Amina was "raised by a single mother" and "had been the victim of multiple childhood traumatic events." Garrett stated that he believed "these unfortunate childhood experiences have had a detrimental impact on [Amina's] personality,

her perceptions, and her views about parenting." In support of his position, Garrett provided excerpts from his daily journal, which he said he "felt compelled to start keeping . . . to protect [himself] from [Amina's] fabrications."

At the DVPO hearing before a court commissioner, the court concluded that Amina met her burden of proving Garrett had perpetrated acts of domestic violence. The court specially highlighted the July 17 eye injury incident as supporting a DVPO's entry and noted that it found Amina's version of events to be more credible than Garrett's. The court found that the children were present for many of the incidents alleged in Amina's petition, including the one on July 17, and that this exposure constituted domestic violence against the children. The court noted that an incident on December 15, 2019—in which Garrett was alleged to have grabbed J.C. around the neck—warranted including the children in the DVPO. The court concluded that Garrett presented a credible threat to Amina and granted her petition. It also ordered Garrett to surrender any weapons in his possession and attend a domestic violence treatment program. Finally, the court stated that the DVPO was subject to any visitation rights granted in the parties' ongoing dissolution proceeding.

Garrett moved for reconsideration, which the commissioner denied. He then moved for revision, which a superior court judge denied.

## ANALYSIS
### Standard of Review

A court commissioner's decision is subject to revision by the superior court. RCW 2.24.050. On a motion to revise, the superior court reviews the

4

commissioner's findings of fact and conclusions of law de novo based on the evidence and issues presented to the commissioner. In re Marriage of Moody, 137 Wn.2d 979, 992-93, 976 P.2d 1240 (1999). "A revision denial constitutes an adoption of the commissioner's decision, and the court is not required to enter separate findings and conclusions." Maldonado v. Maldonado, 197 Wn. App. 779, 789, 391 P.3d 546 (2017). On appeal, we review the superior court's ruling, not that of the commissioner. Maldonado, 197 Wn. App. at 789, 791.

We review the superior court's decision to grant a domestic violence protection order for an abuse of discretion. In re Marriage of Stewart, 133 Wn. App. 545, 550, 137 P.3d 25 (2006). The court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). Where, as here, the court weighed contradictory evidence, "[w]e review the superior court's findings for substantial evidence," and defer to the trier of fact on questions of witness credibility, conflicting testimony, and persuasiveness of the evidence. In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 936-37, 317 P.3d 1068 (2014). Evidence is "substantial" when it is sufficient to persuade a fair-minded person of the truth of the matter asserted. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).

## Motions to Refer

Garrett argues the court abused its discretion by refusing to rule on his motions to file a report with law enforcement or the Department of Social and Health Services (DSHS) or to refer the case to Family Court Services (FCS). We

disagree. The court effectively denied Garrett's motions by granting the DVPO petition.

RCW 26.12.170 provides that the court "may" file a report with law enforcement or DSHS if it has reasonable cause to believe that a child of the parties has suffered abuse or neglect. It also provides that the court "may" order or recommend Family Court Services. RCW 26.12.170. The statute grants the court the ability to make a referral. Therefore, we review the court's determination for an abuse of discretion. See In re Guardianship of Johnson, 112 Wn. App. 384, 387-88, 48 P.3d 1029 (2002).

Here, the court did not file a report with law enforcement or DSHS and did not refer the parties to FCS for an assessment. Instead, after finding that Garrett committed domestic violence against both Amina and their children, the court granted Amina's petition for a DVPO. By granting Amina's petition, the court effectively denied Garrett's requests for referrals. That denial was not an abuse of discretion.[3]

### Garrett's Video Exhibits

Garrett asserts that the court erred by refusing to admit or consider video exhibits that he wished to submit as evidence. However, because the court was unable to play them, Garrett chose to proceed with the hearing without the exhibits rather than postponing the hearing. We conclude that in doing so, he

---

[3] Garrett also claims that both parties moved the court to refer them to FCS. But Amina only requested the court refer the parties to FCS if it was not inclined to grant her a protection order.

waived this issue.

Under RAP 2.5(a), we may refuse to hear any claim of error not raised before the trial court. Waiver requires both knowledge and intent; it is the intentional and voluntary relinquishment of a known right, or conduct that infers relinquishment of such right. Bowman v. Webster, 44 Wn.2d 667, 669, 269 P.2d 960 (1954). "It is a voluntary act which implies a choice, by the party, to dispense with something of value or to forego some advantage." Bowman, 44 Wn.2d at 669. The ability of an attorney to waive a right on their client's behalf depends on the nature of the right, but statutory and procedural rights are typically waivable without the client's express permission on the record. See, e.g., State v. Israel, 19 Wn. App. 773, 779, 577 P.2d 631 (1978) (attorney's waiver of statutory right to examination by two experts in competency hearing); In re Adoption of M.S.M.-P., 184 Wn.2d 496, 500, 358 P.3d 1163 (2015) (attorney's waiver of constitutional right to public proceedings).

At the April 20 hearing, the court informed the parties that it had not been able to review the video exhibits submitted by Garrett's counsel. The court noted that it did not have access to the exhibits and that it was unsure how to view the exhibits—it suggested that counsel might need to appear and play the exhibits in open court. The court stated that the parties could proceed that day without the exhibits or the hearing could be continued to allow the court time to view the exhibits.[4] Garrett's counsel opted to proceed: "I think my client would prefer to go

---

[4] The court offered to grant a shorter than usual continuance: "[I]f it's important that the Court review this prior to . . . a hearing or . . . issuing a

forward." The court then reiterated that it "ha[d] not reviewed any video evidence that was submitted, and that [the video exhibits were] not going to be considered as part of the Court's decision." Garrett's counsel did not object further.

In response to Amina's waiver argument, Garrett urges this court to look to the superior court's ruling on his motion for revision, in which it concluded that it was "unclear from the audio recording of the April 20th hearing" if Garrett waived viewing of the video exhibits by agreeing to go forward. The superior court also determined that, regardless of waiver, it could not review the exhibits because Amina did not consent to being recorded and "it is illegal to record a communication without consent from all parties involved." See RCW 9.73.030(1)(b). Garrett argues that exceptions to the Washington Privacy Act, chapter 9.73 RCW, apply and that the superior court erred in not admitting his exhibits.

Because we conclude that Garrett's actions at the hearing constituted a waiver, we decline to reach whether the exhibits violated the Privacy Act. The record before us clearly demonstrates that Garrett was fully aware of his right to present the video evidence and knowingly and voluntarily chose to relinquish it.[5]

<u>Domestic Violence Protection Order</u>

Garrett maintains that the court abused its discretion by granting Amina's petition for a DVPO because she failed to meet her burden of proving by a preponderance of the evidence that domestic violence occurred. He specifically

---

decision . . . then the best thing I can suggest is . . . a short continuance, like, less than the standard two weeks."

[5] We reviewed a transcript of the hearing, rather than an audio recording.

takes issue with the two incidents the court outlined as examples for the bases for the protection order and claims they were not domestic violence as defined by statute. We disagree and conclude that substantial evidence supports the court's finding that Garrett committed acts of domestic violence.

At the time Amina filed her petition, the Domestic Violence Prevention Act (DVPA), former chapter 26.50 RCW (2019), governed civil domestic violence protection order proceedings.[6] A party seeking a protection order must allege the existence of domestic violence and must be accompanied by an affidavit made under oath stating the specific facts and circumstances from which relief is sought. Former RCW 26.50.030(1) (2005). Domestic violence is "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm" between intimate partners or between family or household members. Former RCW 26.50.010(3) (2019). Evidence demonstrating a present fear based on past violence is a sufficient basis for granting a DVPO. Muma v. Muma, 115 Wn. App. 1, 6-7, 60 P.3d 592 (2002). A person may also petition for protection on behalf of minor household members, regardless of whether those minors witnessed acts of domestic violence or were themselves victims. Former RCW 26.50.020(1)(a) (2019); Rodriguez v. Zavala, 188 Wn.2d 586, 592-93, 598-99, 398 P.3d 1071 (2017). The petitioner must prove each element of former RCW 26.50.030 by a preponderance of the evidence. See Reese v. Stroh, 128 Wn.2d 300, 312, 907 P.2d 282 (1995) (setting out burden of proof in civil cases).

---

[6] The DVPA was repealed by 2021 ch. 215 § 170, effective July 1, 2022. Its provisions are now codified under Civil Protection Orders, ch. 7.105 RCW.

9

To meet this standard, the court must find that it was more likely than not that domestic violence occurred. See In re Marriage of Freeman, 169 Wn.2d 664, 672-73, 239 P.3d 557 (2010).

Here, Amina's declaration alleged that she was "increasingly afraid of Garrett," that "[m]ost of the incidents of violence occur in front of the children or involve them," and that at times, she lived "in extreme fear for [her] life." Her declaration detailed more than 20 episodes of violence toward her and the children. In one of the worst incidents, Garrett slapped Amina's hand with such force that his finger jabbed into her eye and her head slammed backwards, striking a doorframe. A few minutes later, Garrett started filming Amina holding J.C., and told her, "Don't hit me." Amina responded: "You just assaulted me, you went into my eye and my head hit the wall." B.C. also witnessed Garrett recording Amina and appeared "very confused" about what was happening. After that incident, Amina said she "experienced eye pain non-stop for a month and received medical care for [her] eye and head." Attached to her declaration are photos from almost every incident, either of Amina or the children. The photos show red marks, bruises, and scratches consistent with Amina's recounting of the incidents. She also noted that Garrett owns several guns, many of which are stored inside the couple's house, and that she was unsure if the guns were locked or loaded.

After considering the evidence presented by the parties, the court concluded that Amina's version of events was "more credible" than Garrett's. The court found that the parties' children "were present for many of the incidents

alleged in the petition," including the July 17, 2019 incident where Garrett injured Amina's eye. The court also noted that the December 15, 2019 incident—in which Amina alleged that Garrett grabbed J.C. by the neck—supported including the children in the DVPO. Though Garrett denied this allegation, the court again found Amina's account "more credible."

Substantial evidence supports the court's findings and conclusion that Garrett perpetrated domestic violence against Amina and their children. Amina provided detailed a recounting of incidents that resulted in bodily harm, physical injury, and fear of imminent physical harm. And because the parties' children were present for and involved in certain instances of domestic violence, it was appropriate for the court to include them in the DVPO. Rodriguez, 188 Wn.2d at 595-98 (children's exposure to domestic violence constitutes domestic violence).

Garrett contends that the two incidents the court mentioned at the hearing do not constitute domestic violence as a matter of law.[7] We disagree.

First, Garrett asserts that the court wrongly concluded he did not act in self-defense during the July 17 incident in which Amina suffered an eye injury.

_____

[7] Garrett also implies that the two incidents discussed by the court were the only instances of domestic violence the court identified. But Garrett grossly misinterprets the record. The court merely highlighted these two incidents as examples of bases for the DVPO—it did not indicate that these were the only incidents of domestic violence. The court told Garrett's counsel as much after counsel tried to limit the court's ruling:

> MR. BERRY: And, again, if I may, Your Honor, just so I'm clear on the incidence of domestic violence, the one on July 17th . . . that's the assault that the Court is relying upon?

> THE COURT: That is the—that's the explicit one the Court discussed during its ruling, yes.

11

Whether he acted in self-defense is fundamentally a question of fact, susceptible to the court's determination after hearing evidence. See State v. Hatt, 11 Wn. App. 2d 113, 134-35, 452 P.3d 577 (2019) (whether defendant acted in self-defense is a question for the fact-finder). The parties agree that during that incident, Amina held her hand up in front of Garrett and that Garrett hit Amina's hand out of the way. Amina argues that she held her hand up to communicate "stop" and that Garrett responded with violence. Garrett contends that he interpreted Amina's raised hand as an act of aggression and responded by slapping her hand to protect himself. The trial court determined that Amina's story was more credible and Garrett cannot attack the court's credibility determination on appeal. Knight, 178 Wn. App. at 937 ("We defer to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony.").

Second, Garrett claims the court erred by concluding the December 15 incident—in which Amina alleges Garrett grabbed J.C. by the neck—did not constitute "reasonable physical discipline," because it based its conclusion "solely on speculation." The court did not err in determining that Garrett's actions were not reasonable physical discipline.

RCW 9A.16.100 allows parents to use moderate and reasonable physical discipline for purposes of restraining or correcting their children. The statute provides a nonexclusive list of unreasonable physical disciplinary actions including:

(1) Throwing, kicking, burning, or cutting a child; (2) striking a child

with a closed fist; (3) shaking a child under age three; (4) interfering with a child's breathing; (5) threatening a child with a deadly weapon; or (6) doing any other act that is likely to cause and which does cause bodily harm greater than transient pain or minor temporary marks.

RCW 9A.16.100.

In determining whether physical discipline is reasonable, the fact finder should consider the age, size, and condition of the child, the location of the injury, the nature of the misconduct, and the child's developmental level. RCW 9A.16.100; WAC 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.

Amina alleged that on December 15, 2019, "Garrett became physically aggressive with JC and lashed out at him by grabbing him around his neck." In support of this allegation, she provided photos of J.C. after the incident with red marks on his neck. The red marks on J.C.'s neck resemble finger marks, consistent with her story. The court noted that "[Garrett] denie[d] the incident took place and thus [did] not seem to be arguing that this was discipline per RCW 9A.16.100," but that "even if he had made such an argument . . . this conduct is beyond what is reasonable per that statute." The court concluded that "[g]rabbing a child's neck would interfere with a child's breathing and is explicitly stated within the statute as per se unreasonable."

The court did not err in concluding that Garrett's actions were likely to interfere with J.C.'s breathing, and therefore, not reasonable physical discipline under the statute. Contrary to Garrett's assertion, it is not speculative to conclude that grabbing a child by the neck hard enough to leave finger marks would interfere with their breathing. The photos provided by Amina show clear

13

red marks on J.C.'s neck, consistent with Amina's version of the events. The court did not abuse its discretion in granting the DVPO.

Challenges to Findings of Fact

Garrett challenges two of the court's findings of fact as not being supported by substantial evidence: (1) that he presented a credible threat to Amina, and (2) that the couple's children were exposed to domestic violence. We conclude that both findings were supported by substantial evidence.

Evidence is "substantial" when it is sufficient to persuade a fair-minded person of the truth of the matter asserted. Black, 188 Wn.2d at 127.

1. Garrett Presents a Credible Threat

The many episodes of abuse detailed in Amina's declaration demonstrate that Garrett perpetrated acts of domestic violence against her. Amina's description of these incidents, along with the supporting documentation and photos she provided, constitute substantial evidence supporting a finding that Garrett presented a credible threat to Amina.

Garrett attempts to contrast this case with In re Parentage of T.W.J., 193 Wn. App. 1, 367 P.3d 607 (2016). In T.W.J., this court upheld a finding that respondent represented a credible threat based on an e-mail from respondent's counsel to petitioner, in which counsel warned petitioner of respondent's threat to kill her. 193 Wn. App. at 6-7. Garrett asserts that there "is no such evidence here" and that Amina "has never alleged that [Garrett] has ever threatened to physically harm her or their children." But this argument misses the mark. Domestic violence is not confined to threats of physical violence. And Amina *has*

alleged that she felt threatened by Garrett on several occasions. Faced with overwhelming evidence, which it determined credible, and evidence that corroborated Amina's assertions that Garrett habitually committed acts of domestic violence, the trial court did not err in finding that Garrett presented a credible threat to Amina.

2. Children's Exposure to Domestic Violence

The December 15, 2019 incident, in which Garrett is alleged to have grabbed J.C. by the neck constitutes substantial evidence supporting a finding that the children were exposed to domestic violence. The incidents described in the section of Amina's declaration entitled "Past Violence Toward Children," also supports a finding that the children were exposed.

In an attempt to cabin the court's finding that the children were exposed to domestic violence, Garrett asserts that "there is no evidence that any of the parties' children, with the exception of [J.C.], were present at either of the two incidents which the court concluded constituted domestic violence." But the court's finding was not confined to the July 17 and December 15 incidents. The court clarified that those incidents were "the explicit one[s] the Court discussed during its ruling" and did not state that those were the only incidents supporting its findings. And contrary to Garrett's assertion, the record demonstrates that J.C. was not the only child present during the alleged incidents. For example, in March 2018, Amina alleges that Garrett "got physically aggressive with GC by slapping his leg." A few days later, Amina states that Garrett "became physically aggressive with LC by slapping, grabbing and being rough with her and scaring

15

her to the point where she was shaking and crying." Amina recalls Garrett "yelling, being aggressive, domineering, and threatening to LC." Photos of L.C. from after the incident corroborate Amina's story.

We conclude that substantial evidence supports the court's finding that the couple's children were exposed to domestic violence.

### Constitutional Challenges

Garrett raises a series of constitutional challenges on appeal. He asserts the court erred in (1) not considering whether Garrett's constitutional right to parent was affected by the DVPO, (2) not conducting a strict scrutiny analysis, and (3) restricting Garrett's contact with his children. We do not find his arguments persuasive. Washington courts have already determined that the DVPA—and protection orders authorized by it—do not interfere with the constitutional right to parent.

"[P]arents have a fundamental right to autonomy in child rearing decisions." In re Custody of Smith, 137 Wn.2d 1, 13, 969 P.2d 21 (1998). Where a fundamental right is involved we apply the "strict scrutiny" test, which holds that the State may only interfere if it can show that it has a compelling interest and its interference is narrowly tailored to meet that compelling interest. Smith, 137 Wn.2d at 15. This test is satisfied when the State, exercising its parens patriae power, interferes in a parental relationship in which a child has been harmed or there is a credible threat of harm to the child. Stewart, 133 Wn. App. at 555; Smith, 137 Wn.2d at 16. We review constitutional challenges de novo. Aiken v. Aiken, 187 Wn.2d 491, 501, 387 P.3d 680 (2017).

16

Here, the court found that Garrett represented a credible threat to the physical safety of Amina and their children. The court also concluded that Garrett had harmed at least one of the children. Therefore, State interference in the form of a DVPO is justified to protect the children and does not violate Garrett's fundamental right to parent his children. Moreover, there was no error in the court not explicitly considering this right; it had no obligation to rehash settled case law when it granted the DVPO.

Garrett's arguments to the contrary are vague and unavailing. While he recognizes the State may interfere in a parental relationship when a child has been harmed or if there is a credible threat of harm, he maintains that the incidents the court relied on do not provide substantial evidence that any of the children were harmed. Relying on In re Marriage of C.M.C., Garrett claims that the incidents the court relied on are "de minimus" and that there is no compelling State interest where there are only "isolated, de minimus incidents which could technically be defined as domestic violence." 87 Wn. App. 84, 88, 940 P.2d 669 (1997). In C.M.C., this court, in dicta, noted that the commentary to the proposed Parenting Act of 1987 stated that the term "history of domestic violence" was intended to exclude "isolated, de minimus incidents which could technically be defined as domestic violence." 87 Wn. App. at 88 (quoting 1987 PROPOSED PARENTING ACT: REPLACING THE CONCEPT OF CHILD CUSTODY: COMMENTARY AND TEXT 29 (undated)). But that statute was later amended and is not at issue in the present case. Moreover, regardless of the precedential value of C.M.C., the incidents alleged here are certainly not de minimus or isolated. Rather, the

record demonstrates a history of domestic violence spanning several years. As previously discussed, substantial evidence supports the court's finding that Garrett posed a credible threat to the children.[8]

Relying next on State v. Ancira, Garrett asserts that any restriction of his contact with his children must be "reasonably necessary" and that limiting his contact to one hour a week over FaceTime or Zoom was not reasonably necessary. 107 Wn. App. 650, 27 P.3d 1246 (2001). But Ancira is distinguishable. Ancira involved a sentencing condition in a criminal case that prohibited the defendant from having contact with his children for five years. 107 Wn. App. at 652-53. On appeal, this court concluded that the evidence was insufficient to support such a severe prohibition against contact. Ancira, 107 Wn. App. at 654. Here, the evidence amply supported restricting contact and the DVPO is subject to residential provisions granted in the parties' ongoing dissolution proceeding. We conclude that the DVPO does not infringe upon Garrett's constitutional rights.

### Domestic Violence Treatment

Garrett contends that the court abused its discretion by ordering him to participate in domestic violence treatment and the DV Dads program because

---

[8] After argument, Garrett filed a Supplemental Memorandum Clarifying Responses to Questions Raised During Oral Argument and a related motion for leave to file that memorandum. He cites RAP 18.8(a) as authority allowing us to consider his arguments even though they are made outside of the normal briefing and argument process. RAP 18.8(a) allows us to waive the requirements of the rules of appellate procedure where we find it appropriate. We decline to exercise our discretionary powers under RAP 18.8(a) and do not consider his supplemental briefing.

such programs lack proof of efficacy. He also claims that ordering him to partake in treatment violates his constitutional rights. Both assertions are incorrect.

The DVPA authorizes courts to "[o]rder the respondent to participate in a domestic violence perpetrator treatment program approved under RCW 26.50.150."[9] Former RCW 26.50.060(1)(e) (2020).

Garrett asserts that the court violated his constitutional rights by ordering him to participate in a treatment program lacking proof of efficacy. He insists that "[n]o state interest is furthered by ordering a parent to complete a domestic violence treatment program which lacks evidence of efficacy." In support of his argument, Garrett relies on a 2013 report from the Washington State Institute for Public Policy.[10] But that report was disapproved of by Washington's Domestic Violence (DV) Manual for Judges as mischaracterizing the Domestic Violence Perpetrator Treatment Program, ch. 388-60B WAC, and using generally flawed research methodology. See GENDER & JUST. COMM'N, WASH. STATE SUP. CT., DOMESTIC VIOLENCE MANUAL FOR JUDGES app. B (2016) (APPENDIX B), https://www.courts.wa.gov/content/manuals/domViol/appendixB.pdf [https://perma.cc/C89R-RNEB].[11]

---

[9] Former RCW 26.50.150 (2019) has been recodified as RCW 43.20A.735.

[10] M. MILLER, ET AL., WASH. STATE INST. FOR PUB. POL'Y (WSIPP), WHAT WORKS TO REDUCE RECIDIVISM BY DOMESTIC VIOLENCE OFFENDERS? (2013), https://www.wsipp.wa.gov/ReportFile/1119/Wsipp_What-Works-to-Reduce-Recidivism-by-Domestic-Violence-Offenders_Full-Report.pdf [https://perma.cc/6DKL-XKM2].

[11] For example, the DV Manual notes that the studies underlying the 2013 WSIPP report have been "extensively critiqued in multiple peer journals." APPENDIX B at 3 n.10. The DV Manual also states that WSIPP's conclusions "are

But Garrett fails to acknowledge that in 2018, the WAC chapter governing domestic violence treatment programming was repealed and replaced by WAC 388-60B. The updated WACs require an initial assessment to determine the "level of risk, needs, and responsivity for the participant" and the "level of treatment the program will require for the participant." WAC 388-60B-0400(2)(a)-(b). The purpose of this assessment is to provide "[b]ehaviorally focused individualized treatment goals or objectives for an initial treatment plan." WAC 388-60B-0400(2)(c). After the assessment, the program is required to write a summary including its findings, recommendation, and rationale for the level of treatment prescribed. WAC 388-60B-0400(19). And as part of this process, assessors are authorized to recommend no domestic violence intervention treatment where appropriate. WAC 388-60B-0400(10) and (19)(f). These procedures minimize the risk that Garrett will receive treatment that is unnecessary or unhelpful. The court did not abuse its discretion in ordering him to participate in treatment.

<u>Best Interests of the Children</u>

Garrett argues that the court erred in granting the DVPO without considering the best interests of the children. We conclude that the court considered the best interest of the children by granting the DVPO.

The Parenting Act of 1987, chapters 26.09, 26.10 RCW, requires the court to consider the best interests of the children when entering a parenting plan.

---

not only inaccurate but simply cannot be supported either by the authors own meta-analysis or by a comprehensive review of the literature." APPENDIX B at 3 n.10.

20

RCW 26.09.184(1)(g); RCW 26.09.002. Former RCW 26.50.060(1)(d) provides that "[o]n the same basis as is provided in chapter 26.09 RCW, the court shall make residential provision with regard to minor children of the parties." However, the court is not required to "incorporate the full panoply of procedures and decision factors from the Parenting Act into the protection order proceeding" because that proceeding is intended to be "a rapid and efficient process." Stewart, 133 Wn. App. at 552. And the court does not need to make formal findings or follow formal proceedings as it would when entering a parenting plan. Stewart, 133 Wn. App. at 553. Rather, it only needs to consider the same factors in making its temporary orders. Stewart, 133 Wn. App. at 553.

Here, the court considered the best interests of the children by granting the DVPO after finding that Garrett presented a credible threat to the children. Garrett's assertion that "the lower court never even considered the best interests of these children" is not only unsupported by the record but directly contradicted by it. The court found that the children "were present for many of the incidents alleged in the petition" and that "exposure to domestic violence is domestic violence to the children and is sufficient to support a domestic violence protection order that protects the children as well." A denial of the DVPO petition, or ignoring its existence when entering residential provisions, would have been a failure to consider the best interests of the children. The court did not err.

Fees

Amina requests attorney fees on appeal under former RCW 26.50.060 and RAP 18.1. Garrett contends that because Amina did not request fees before

21

the trial court, she cannot request them on appeal.  He also asserts that Amina cannot recoup fees under former RCW 26.50.060 because it has been repealed and is no longer an "applicable law" as required by RAP 18.1.  We award Amina her reasonable attorney fees.

When Amina filed her petition, former chapter 26.50 RCW governed civil DVPO proceedings.  That chapter still governs this proceeding.  Under former RCW 26.50.060(1)(g), the court has discretion to require a respondent in a DVPO proceeding to pay petitioner's reasonable attorney fees.  RAP 18.1 provides that the prevailing party on appeal may recover fees where fees are permitted at the trial court level.  Because Amina is the prevailing party on appeal, she is entitled to her reasonable attorney fees.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____          _____
Díaz, J.                                                        Mann, J.