IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No.  40585-1-III |
| | ) | (consolidated with |
| J.S.P., J.J.P. † | ) | No. 40586-9-III) |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |

COONEY, J. — D.P., the father of J.J.P. and J.S.P., appeals the order that terminated the parent-child relationship between him and his children.  On appeal, D.P. argues the Department of Children, Youth, and Families (Department) failed to engage in active efforts sufficient to remediate barriers to his reunification with his children; namely, providing him a neuropsychological evaluation and access to stable housing.  D.P. further claims that six of the trial court's findings of fact are not supported by substantial evidence.  We affirm the termination of D.P.'s parental rights and remand for the trial court to correct the scrivener's errors related to the six challenged findings.

---

† To protect the privacy interests of J.J.P. and J.S.P., we use their initials throughout this opinion.  Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018), http://www.courts.wa.gov/appellate_trial_courts.

No. 40585-1-III (consol. with 40586-9-III)
*In re Dependency of J.S.P, J.J.P.*

BACKGROUND[1]

D.P. and H.L.[2] are the biological parents of J.J.P., born in September 2012, and

J.S.P., born in July 2016.  In October 2021, D.P and H.L. were found in their home

unconscious from an opioid overdose with their children present.  The Department filed a

petition for dependency, and the children were placed in out-of-home care.  Both parents

initially denied Native American ancestry.  Over the next 18 months, D.P. denied Native

American ancestry on five more occasions.  The dependency court ordered D.P. to

complete a chemical dependency assessment, submit to random urinalysis testing,

complete mental health treatment, and follow any recommendations made by the service

providers.

Over the next 16 months, D.P. was largely noncompliant with the services ordered

and lacked progress toward correcting his parental deficiencies.  Consequently, the

Department filed a petition to terminate the parent-child relationship between D.P. and

the children in March 2023.  The Department claimed in the petition that D.P.'s parental

deficiencies were untreated substance use and mental health issues, an instability of

resources due to substance use, a risk of neglect to the children due to D.P.'s history with

---

[1] Because D.P. does not challenge the basis underlying the termination of his parental rights (ongoing substance abuse issues), we provide limited background information and cite additional facts in the analysis below.

[2] H.L. relinquished custody of the children to the Department and consented to the termination of her parental rights.

the Department, inadequate parenting skills, and a demonstrated lack of commitment to his parental responsibilities. Trial was initially scheduled for July 2023.

On April 26, 2023, after previously denying Native American ancestry on six occasions, D.P. claimed Native American ancestry through his paternal grandmother. Due to D.P.'s belated disclosure, the dependency court found there was "reason to know" that the children were American Indian children, implicating the Indian Child Welfare Act (ICWA) and the Washington Indian Child Welfare Act (WICWA). The court then continued the termination trial into October 2023. The trial was later continued into June 2024. Based on the court's finding that the ICWA and WICWA applied, the Department was required to meet the heightened standard of making active efforts to prevent the breakup of D.P.'s American Indian family.

In April 2024, the Department learned that D.P. had been seen in the emergency room of a local hospital for seizures due to drug withdrawals. In a declaration dated May 15, 2024, D.P. reported, for the first time, that he suffered seven or eight seizures over the past four years that resulted in significant memory issues.[3] D.P. requested the Department provide a psychological evaluation to him.

---

[3] D.P. reported having seizures while experiencing withdrawals during an assessment in October 2022. At that time, however, D.P. did not disclose that the seizures caused memory issues or were an obstacle to engaging in services.

A dependency review hearing was held the next day, and D.P. requested the court amend his court-ordered service plan to include a neuropsychological evaluation due to his purported memory issues. The court denied D.P.'s request, noting that he had regularly attended and participated in the dependency review hearings and had never disclosed seizures or memory issues during the two-and-one-half years of dependency proceedings. The court found that D.P. had significant chemical dependency issues, his reported seizures occurred during withdrawals, and there was a lack of evidence that his failure to attend treatment was due to memory issues. In support of the court's findings, it noted D.P.'s admission to a social worker that he was hiding from those attempting to take him to detox. Lastly, the court found that D.P.'s claim of memory issues and request for a neuropsychological evaluation, made the day before the review hearing and three weeks prior to the termination trial, was an effort to continue the termination trial for the fifth time.

Trial on the Department's petition was held in mid-June 2024. The Department offered testimony from an ICWA Qualified Expert Witness and various service providers and social workers who had engaged with D.P. during the dependency. Evidence was presented of (1) D.P.'s opiate use disorder diagnosis; (2) D.P. failing to appear for scheduled urinalysis tests; (3) D.P. providing urinalysis samples that tested positive for morphine, methamphetamine, fentanyl, alcohol, and marijuana; (4) D.P. being reassessed and diagnosed with severe opiate and amphetamine use disorders; and (5) D.P.'s parental

deficiencies due to substance abuse could not be overcome in the near future. A Department social worker testified that (1) D.P. initially missed approximately 50 percent of the scheduled visits with his children, and that later increased to about 75 percent, (2) the emotional impact on the children when D.P. missed visits, (3) D.P.'s admitted use of methamphetamine and fentanyl, his multiple relapses, and his drug use as recent as April 2024, and (4) D.P. admitting to actively avoiding contact with her and making excuses for not going to services because he was not ready to engage in services and had anxiety about attending services.

At the conclusion of trial, the court entered extensive findings of fact and conclusions of law. The court ordered the termination of the parent-child relationship between D.P. and his children, J.J.P and J.S.P.

D.P. timely appeals.

## ANALYSIS

### ACTIVE EFFORTS

D.P. argues the Department did not engage in active efforts to prevent the breakup of his American Indian family because it failed to provide him with a neuropsychological evaluation and stable housing. We disagree a neuropsychological evaluation was a necessary or court-ordered service and that the Department failed to engage in active efforts related to D.P.'s housing needs.

Parental custody of a child is a fundamental right, guarded by the Fourteenth Amendment to the United States Constitution. *In re Custody of Smith*, 137 Wn.2d 1, 13, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion). Given the fundamental right to parent one's children, state interference is justified only if the State can show that it has a compelling interest and that such interference is narrowly drawn to meet only the compelling interest involved. *Smith*, 137 Wn.2d at 15; *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980).

To terminate the parent-child relationship, the Department must satisfy a two-part test. First, the Department must establish the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020). Next, if the six elements of RCW 13.34.180(1) are proven, the Department must establish, by a preponderance of the evidence, that termination of the parent-child relationship is in the best interest of the child. RCW 13.34.190(1)(b).

Under RCW 13.34.180(1)(d), the Department must demonstrate that it expressly and understandably offered or provided all court-ordered services and all services necessary and reasonably available that are capable of correcting the parental deficiencies within the foreseeable future. *Id.* In termination proceedings involving an American Indian child, the Department must further demonstrate it engaged in active efforts to prevent the breakup of the at-risk American Indian family. 25 U.S.C. § 1912(d); 25 CFR

6

§ 23.2; RCW 13.38.130(1). Active efforts is a more stringent standard than the "reasonable efforts" standard. *In re Dependency of R.D.*, 27 Wn. App. 2d 219, 231, 532 P.3d 201 (2023). "Active efforts" means "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. Active efforts must be "tailored to the facts and circumstances of the case" and be provided to the parent in a timely and diligent manner. 25 C.F.R. § 23.2; RCW 13.38.040(1)(a). Thus, the Department must work with the parent to "overcome barriers" to the provision of services. 25 C.F.R. § 23.2(2); *see R.D.*, 27 Wn. App. 2d 219. If the Department is unable to provide "optimum services" or the services do not exist or are unavailable, it must consider "alternative ways to address the needs of the Indian child's parents and, where appropriate, the family" and meaningfully engage with the parent to address their needs. 25 C.F.R. § 23.2(10); *In re Dependency of G.J.A.*, 197 Wn.2d 868, 895, 489 P.3d 631 (2021).

Whether the Department has met the active efforts requirement is a mixed question of law and fact. *In re Dependency of A.L.K.*, 196 Wn.2d 686, 697, 478 P.3d 63 (2020). "We review the underlying findings for substantial evidence, but review de novo whether those findings satisfy the requirements of [the] ICWA" and WICWA. *In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 37, 456 P.3d 820 (2020), *abrogated by G.J.A.*, 197 Wn.2d at 901 n.16, 906 n.17. We consider undisputed findings of fact verities on appeal. *State v. Conners*, 90 Wn. App. 48, 53, 950 P.2d 519 (1998).

Substantial evidence exists if it is sufficient to persuade a rational, fair-minded person that the finding is true. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). We review the evidence, including all reasonable inferences, in the light most favorable to the prevailing party. *Real Carriage Door Co. ex. rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). We will not reweigh credibility on appeal nor disturb the trial court's findings unless there is an absence of clear, cogent, and convincing evidence in the record. *Garza v. Perry*, 25 Wn. App. 2d 433, 453, 523 P.3d 822 (2023); *D.H.*, 195 Wn.2d at 718.

### *Neuropsychological Evaluation*

D.P. alleges the trial court erred in finding all necessary services reasonably capable of correcting parental deficiencies were offered under RCW 13.34.180(1)(d). Specifically, D.P. argues the Department did not provide active efforts because it failed to provide him with a neuropsychological evaluation to address his purported memory issues.

In a termination proceeding, the inquiry is not limited to court-ordered services offered or provided to the parent. The Department must have also "offered all necessary available services." *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016). A "necessary service" is one "'needed to address a condition that precludes reunification of the parent and child.'" *D.H.*, 195 Wn.2d at 719 (quoting *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 480, 379 P.3d 75 (2016)). The Department must

8

provide all necessary services, reasonably available, to address a condition that precludes reunion of the parent and child, regardless of whether the condition can be labeled a parental deficiency. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010).

Here, we disagree with D.P. that a neuropsychological evaluation was a necessary service because it was not a "primary factor" preventing reunification with his children. In October 2022, D.P. reported to a treatment provider that he had seizures while withdrawing from drugs. He did not claim the seizures caused memory issues or were an obstacle to engaging in services. Nearly two years later, and just a few weeks before trial, D.P. informed the court for the first time that he experienced seven or eight seizures over the past four years that caused him significant memory issues.

Based on D.P.'s self-reported seizures and purported memory issues, D.P. requested a neuropsychological evaluation. The trial court denied D.P.'s request, noting that his self-serving declaration was the sole basis underlying the request. The trial court found that (1) D.P. had never disclosed having seizures or memory issues over two-and-one-half years of dependency hearings; (2) D.P. had significant chemical dependency issues and his reported seizures occurred during withdrawals; (3) there was a lack of evidence that D.P.'s failure to attend treatment was due to memory issues; and (4) D.P.'s claim of memory issues and request for a neuropsychological evaluation made the day before the review hearing and three weeks before trial was an effort to continue the termination trial for the fifth time. We decline to reweigh the trial court's credibility

findings associated with D.P.'s request. We also decline to disturb the court's findings as there is not an absence of clear, cogent, and convincing evidence in the record.

Substantial evidence supports the trial court's finding that a neuropsychological evaluation was not a primary factor preventing the reunification of D.P. and his children. Thus, the Department was not required to make active efforts to provide D.P. with a neuropsychological evaluation.

*Housing*

D.P. argues the Department did not engage in active efforts to address his housing instability. We disagree.

Throughout the dependency, the court consistently found D.P.'s "homelessness or lack of suitable housing" was a significant factor preventing the return of the children to him. Ex. 7 at 7. However, between October 2021, when the Department filed the dependency petition, and April 2023, when D.P. first informed the court of his Native American ancestry (after having denied Native American ancestry on six previous occasions), the Department did not have reason to know it had a heighted duty to provide active efforts. Thus, we limit our review of whether the Department made active efforts to address D.P.'s housing needs to the period between April 2023 and June 2024.

Rebecca Hunter was D.P.'s social worker from September 2022 to April 2024. Ms. Hunter testified that housing assistance was court ordered in October 2022 and that D.P. had resided with his mother during much of the time she was assigned to his case.

Ms. Hunter described D.P.'s housing situation as "suitable and stable." Rep. of Proc. (RP) at 280. D.P.'s mother moved to Montana in November 2024. Thereafter, D.P. reported that he had been staying in shelters and that he and his father were residing in the house his mother had vacated. Ms. Hunter had discussions with D.P. about which shelters were "more appropriate," provided him with information on Catholic Charities, gave him pamphlets and lists of resources, taught him how to use the "ShelterMeSpokane" website, and offered to assist him with transportation related to his housing needs. RP at 280, 289.

Kayla Webley, another Department social worker, was assigned to D.P.'s case after Ms. Hunter. Ms. Webley provided D.P. resources for housing and housing assistance. By February 2024, the Department had attempted to assist D.P. with housing and provided him with resources multiple times. D.P. declined any assistance, reporting that he was planning on beginning inpatient treatment before looking for housing. Ms. Webley found it difficult to get D.P. to engage or communicate. Consequently, the Department "attempted to brainstorm different ideas to connect with [D.P.]" RP at 358. D.P. agreed to meet with social workers at a library. Social workers went to the library armed with "a significant amount of different resources in the community" as well as gas cards and vouchers. RP at 359. D.P. did not appear for the meeting. On May 3, D.P. moved to his mother's residence in Montana.

After the court was informed of D.P.'s Native American ancestry, D.P. either had stable and suitable housing with his mother or the Department expressly and continuously offered D.P. housing resources and assistance. The housing resources and assistance were offered to remove any barriers to D.P.'s engagement in the programs designed to overcome his parental deficiencies. Substantial evidence supports the trial court's finding that the Department engaged in active efforts to address D.P.'s housing issues.

INCORRECT SURNAME OF D.P.

D.P. argues that six of the trial court's findings of fact are not supported by substantial evidence because the trial court referred to D.P. by the incorrect surname of "Parker." Appellant's Op. Br. at 46. Thus, D.P. asserts the court's findings fail to support the associated conclusions of law. The Department responds the trial court merely made scrivener's errors that are not substantive in nature. The Department requests we remand for the trial court to correct the identified errors. We agree with the Department.

A scrivener's error is a clerical mistake that, if corrected, would support a court's true intention as supported by other evidence. *State v. Wemhoff*, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022). Remand for correction is the appropriate remedy for a scrivener's error. *Id.*

D.P. assigns error to six of the trial court's findings of fact because the court referenced a surname other than that of D.P. However, the court referenced D.P.'s

12

correct surname over 200 times in the same document. Further, the facts found by the court in which it used an incorrect surname mirror the evidence bearing on D.P.'s actions or inaction for each of the findings. Lastly, the record is void of an individual with the surname of "Parker." Correction of the challenged surname to D.P.'s surname would reflect the court's intention as supported by the evidence. The incorrect surname was merely a scrivener's error.

## CONCLUSION

We affirm the termination of the parent-child relationship between D.P. and his children, J.J.P. and J.S.P., and remand for the limited purpose of correcting the scrivener's errors.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____  _____
Lawrence-Berrey, C.J.      Staab, J.